## CONSOLIDATED FOODS CORPORATION, Plaintiff-Appellant,

v.

## UNITED STATES of America, Defendant-Appellee.

No. 77–1212.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 3, 1977.

Decided Jan. 11, 1978.

---

W. Stephen Perry, Paul W. Clevenger, Chicago, Ill., for plaintiff-appellant.

Myron C. Baum, Acting Asst. Atty. Gen., Jonathan S. Cohen, Atty., Tax Div. Dept. of Justice, Washington, D. C., Thomas P. Sullivan, U. S. Atty., Chicago, Ill., for defendant-appellee.

Before PELL and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.*

PELL, Circuit Judge.

This case involves a claim for refund of federal income taxes. The plaintiff filed a complaint in the district court seeking recovery of the taxes paid for the years 1963 and 1965 through 1971. The parties, following the filing of the defendant's answer, submitted the case for decision on the basis of a stipulation of facts. Both parties filed motions for summary judgment. The district court granted summary judgment to the defendant and this appeal followed.

The plaintiff, Consolidated Foods Corporation, is a successor in interest to Kitchens of Sara Lee, Inc. (Sara Lee-U.S.). In 1963, Sara Lee-U.S. entered into a contract with Kitchens of Sara Lee (Canada) Ltd. (Sara Lee-Canada), another wholly owned subsidiary of Consolidated Foods Corporation under which Sara Lee-U.S. transferred to Sara Lee-Canada an exclusive and perpetual right to use its Canadian licensed trademark, "Sara Lee," in Canada. Sara Lee-U.S. retained certain rights, *inter alia*, the right to maintain product quality standards, the right to prohibit sublicensing or subassignment without prior consent, and the right to bare legal title. Sara Lee-U.S. received, as consideration, royalties on the net sales by Sara Lee-Canada of products sold under the "Sara Lee" mark. The agreement was of perpetual duration, but it could be terminated by Sara Lee-U.S. upon Sara Lee-Canada's insolvency or default.

Sara Lee-U.S. treated the royalty payments from Sara Lee-Canada as long-term capital gain. Upon audit, the Internal Revenue Service determined that the payments constituted ordinary income, rather than capital gain, and assessed deficiencies on that basis. Sara Lee-U.S. paid the additional taxes as assessed and ultimately filed suit for a refund. The district court found that the trademark in question was a capital asset, and neither party has challenged this finding. Therefore, the only issue we need address in this appeal is whether the agreement was a sale, in which case the payments involved could be treated as long-term capital gains, or a license, in which case the payments must be treated as ordinary income.

This issue of whether a transfer of the use of a trademark is a sale or a license for tax purposes is a thorny one, and has not always been consistently solved in the courts. The basic problem is to determine the extent to which the transferor retains proprietary rights in the transferred asset. If the transferor retains sufficient proprietary rights, the transfer must be considered a license rather than a sale. The relevant case law lacks clear standards as to how restrictive the agreement may be before it constitutes a license instead of a sale, and, indeed, reflects a splintering of authority among the several courts of appeals. Con-

---

* The Hon. William J. Campbell, United States District Court for the Northern District of Illinois, is sitting by designation.

gress, responding to the need for uniform treatment of this issue, enacted Pub.L. 91–172, § 516, 26 U.S.C.A. § 1253, as part of the Tax Reform Act of 1969.[1] This legislation, however, is applicable only to transfers made after December 31, 1969. We cannot look to this statute for aid in interpreting the existing case law because the legislative history of the statute indicates that it did not codify existing case law. S.Rep.No.91–552, 91st Cong., 1st Sess. 208, U.S.Code Cong. & Admin.News, 1969, p. 1645. Accordingly, we must begin our analysis by surveying the confused and unsettled case law.

Because the resolution of the issue here presented basically requires a close analysis of the particular contractual and factual situation, and inasmuch as a series of cases in several circuits involving the tax treatment of various Dairy Queen franchises adequately illustrate applications determined appropriate to the resolution of the taxable status, we turn in some detail to a consideration of those cases.

In the first of these cases, *Dairy Queen of Oklahoma, Inc. v. Commissioner of Internal Revenue*, 250 F.2d 503 (10th Cir. 1957), one McCullough acquired from the patentee an exclusive right and license to use, manufacture, sell, and distribute a patented freezing and dispensing machine in certain states. McCullough then contracted with the taxpayer granting to the taxpayer the sole and exclusive right and franchise for the manufacture, preparation, and distribution of the Dairy Queen product within the state of Oklahoma. The taxpayer agreed to pay McCullough in consideration a lump sum plus four cents per gallon on all of the product taxpayer sold within Oklahoma. The taxpayer then joined with two other persons and formed a corporation called Dairy Queen of Oklahoma. This taxpayer-corporation entered into a number of franchise agreements granting to a "licensee" an exclusive territory within the state of Oklahoma for the preparation, sale, and distribution of the product. The taxpayer-corporation agreed to furnish the licensee with Dairy Queen freezers which would remain the property of the corporation, furnish the Dairy Queen formula, assist in obtaining a source of supply to be approved by the corporation, train key personnel, and otherwise assist in opening the first store. The licensee agreed to provide a suitable location, maintain quality standards, and dispense no other product than Dairy Queen from the store. It also agreed to pay $1,875 plus 35 cents "royalty" for each gallon of mix processed in the machines. If the con-

1. Section 1253 provides in pertinent part:

(a) General rule.—A transfer of a franchise, trademark, or trade name shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name.

(b) Definitions.—For purposes of this section—

(1) Franchise.—The term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area.

(2) Significant power, right, or continuing interest.—The term "significant power, right, or continuing interest" includes, but is not limited to, the following rights with respect to the interest transferred:

(A) A right to disapprove any assignment of such interest, or any part thereof.

(B) A right to terminate at will.

(C) A right to prescribe the standards of quality of products used or sold, or of serv-

ices furnished, and of the equipment and facilities used to promote such products or services.

(D) A right to require that the transferee sell or advertise only products or services of the transferor.

(E) A right to require that the transferee purchase substantially all of his supplies and equipment from the transferor.

(F) A right to payments contingent on the productivity, use, or disposition of the subject matter of the interest transferred, if such payments constitute a substantial element under the transfer agreement.

(c) Treatment of contingent payments by transferor.—Amounts received or accrued on account of a transfer, sale, or other disposition of a franchise, trademark, or trade name which are contingent on the productivity, use, or disposition of the franchise, trademark, or trade name transferred shall be treated as amounts received or accrued from the sale or other disposition of property which is not a capital asset.

tract was violated, the corporation had the right to enter and remove its machines. The Tax Court held that this agreement constituted a license rather than a sale, and thus both the lump sum and the royalties were ordinary income rather than capital gain. The Tenth Circuit reversed holding that the agreement constituted a sale. It reasoned that the restrictions in the transfer were conditions subsequent intended to insure uniform standards for the trade name product sold state-wide. These conditions were designed to protect the respective rights of the parties and did not impair the transferee's exclusive right to make and sell the product in its territory. The court added that the gallonage payment also did not impair the transferee's exclusive right.

The Fourth Circuit reached a somewhat different result in *Estate of Gowdey v. Commissioner of Internal Revenue*, 307 F.2d 816 (4th Cir. 1962). The taxpayer obtained from McCullough the Dairy Queen rights for the state of Virginia. The taxpayer then entered into several franchise agreements which included the same type of restrictions as those in the *Dairy Queen of Oklahoma* case. As in that case, the Tax Court held the agreements were mere licenses. The Fourth Circuit reversed as to the lump-sum payments holding that these payments were to be treated as capital gain. In a supplemental opinion, however, the court held that the gallonage payments were to be treated as ordinary income. 307 F.2d at 820.

The Fifth Circuit's position is consistent with that of the Fourth Circuit. In *Moberg v. Commissioner of Internal Revenue*, 305 F.2d 800 (5th Cir. 1962), the taxpayers acquired Dairy Queen rights for the states of Washington and Oregon. They then entered into several franchising agreements for various territories within these states. These agreements took four different forms, each form including slightly different restrictions. The Fifth Circuit concluded that the various restrictive categories were designed to maintain quality, to insure

sanitary dispensing conditions and uniform standards for the trade name product, to protect each subfranchise purchaser against other purchasers with respect to territory, to protect the seller with respect to the contract with McCullough, and to insure the ascertainment and collection of contractual sums due by way of fixed prices and royalties. These restrictions thus were not of such a nature as to render the agreements mere licenses. Although the court afforded capital gain treatment to the lump-sum payments, it remanded to the Tax Court the question of whether the royalties should be treated as capital gains. On remand, the Tax Court, although previously reversed by the Tenth Circuit on this issue, maintained its consistent position that these gallonage-royalty payments were ordinary income. The Fifth Circuit agreed, *Moberg v. Commissioner of Internal Revenue*, 365 F.2d 337, 340 (5th Cir. 1966), stating that "[i]t is also consistent with the policies underlying the distinction between capital gains and ordinary income to regard the continuing gallonage payments as the yield of a retained interest in future earnings."

On virtually identical facts, the Ninth Circuit reached a different result. In *Moberg v. Commissioner of Internal Revenue*, 310 F.2d 782 (9th Cir. 1962), the court faced the same issue involving the same four forms of agreements addressed in the Fifth Circuit *Moberg* cases. The Ninth Circuit, however, distinguished among the four forms of agreements concluding that one of the forms, the "ten paragraph agreement," constituted a sale while the other three forms of agreements were merely licenses.[2] As to the "ten paragraph agreement," the court did not specify ordinary income treatment for the lump-sum payment as did the Fourth and Fifth Circuits. Instead, it apparently prescribed capital gain treatment for both the lump-sum and royalty payments. As to the other three forms of agreements, the court interpreted the restrictions therein as reserving to the grantor-taxpayer "a power to exercise continu-

---

**2.** The restrictions in each of the four forms of agreements are set forth in the Fifth Circuit opinion, 305 F.2d at 802–04, and therefore, will not be repeated in this opinion.

ing, active, operational control in areas which may well affect the success of the grantees' business and the extent of their financial obligations to the grantors under the subfranchise." *Id.* at 784. The court emphasized that these restrictions were not fixed by contract, but remained to be determined by the grantors under a continuing power to make policy determinations with respect to these restrictions. Retention of such powers was not consistent with a sale.

The Eighth Circuit's contribution to the Dairy Queen line of cases is *United States v. Wernentin,* 354 F.2d 757 (8th Cir. 1965). Jester, the taxpayer in this case, obtained the Dairy Queen rights in the state of New Jersey from McCullough. He then contracted with Dinkens in two separate agreements whereby he granted to Dinkens these New Jersey rights. The contracts, although different in certain respects, provided, *inter alia,* that Dinkens must order freezers through Jester, that Jester was to deal with the manufacturer regarding any adjustment for defective parts, that Jester must approve any subcontract negotiated by Dinkens, that Jester must give prior written permission before another product could be sold on a store's premises and before a freezer could be sold or another type of freezer used, and that Dinkens was to purchase only high grade equipment and supplies. One contract required "every effort" by Dinkens to open three outlets by a specific time, and provided that if he did not, Jester could, at his option, terminate Dinkens' right to develop the territory further. The other contract provided that Dinkens was to make "every effort" to establish stores until the territory was fully developed. If he defaulted with respect to this provision, Jester could extinguish Dinkens' rights of further development. The Eighth Circuit, speaking through then Judge, now Justice Blackmun, stated:

> We might of course apply to all these rights possessed by Jester the convenient label of a condition subsequent. We choose not to do so, for we feel that,

instead, they tend to characterize the relationship existing between the parties and to demonstrate that Jester retained an interest in the New Jersey Dairy Queen operations which was substantial and which was, in character, active commercial participation.

*Id.* at 763. Unlike the Fourth, Fifth, and Tenth Circuits, the court held that both the lump-sum and the royalty payments were ordinary income.[3]

In comparing the agreements in the Dairy Queen cases to the agreement in the instant case, we note several similarities. All involved the transfer of an exclusive right to use a trademark; all included some type of quality control powers retained by the transferor; all involved a royalty payment tied to the amount of product sold by the transferee; all described the agreement using the terms "license" and "royalties"; and all gave the transferor the right to terminate upon default of the transferee. The instant agreement also contained some other similarities to some, but not all, of the Dairy Queen agreements.

Turning to the differences between the Sara Lee agreement and the Dairy Queen agreements, we will not detail the several rather insignificant differences, but rather we will note the critical difference to be the royalty arrangement. In the Sara Lee agreement, the royalty payments were the only form of consideration. There was no lump-sum payment. All the Dairy Queen cases involved a lump-sum payment plus a continuing royalty arrangement. This distinction requires us to look more closely at how the various courts in the Dairy Queen cases treated the royalty payments.

The Fourth and Fifth Circuits clearly held that the royalty payments were to be treated as ordinary income, while the lump-sum payment was to be treated as capital gain. The Eighth Circuit treated both the royalties and the lump-sum payments as ordinary income. The Ninth Circuit did not

---

**3.** The court, however, relied heavily upon the transferor's course of conduct and declined to speculate on what it would have concluded had the record "contained only the cold contracts." 354 F.2d at 766.

specifically address the royalty payments as a separate issue. It held that the payments, apparently both lump-sum and royalties, under one form of the agreements were capital gain, whereas the payments under the other three forms of agreements were ordinary income. The Tenth Circuit alone clearly held that the royalty payments and the lump-sum payments were to be treated as capital gain.

We need not adopt *in toto* the position of any of the above circuits, because we do not believe that the royalty arrangement should be analyzed separately from the other provisions of the agreement, especially if, as here, the royalties are the only form of monetary consideration. We agree with the Eighth Circuit in *United States v. Wernentin, supra* at 761–62, that "in these ordinary income-capital gain situations each case is to be decided upon its particular facts; [and] that no fixed formula exists for resolving the issue." It is, therefore, to the particular facts of the present case that we now turn.

Important to our conclusion in this case is the fact that the only form of monetary consideration passing from the transferee to the transferor-taxpayer was royalty payments. This arrangement precludes us from treating the royalty payments as something other than consideration for the transfer of the right to use the trademark. In *Estate of Gowdey, supra* at 820, the Fourth Circuit reasoned that the lump-sum payment was paid in satisfaction of the transferred rights and that the royalty payments were not part of the sale of these privileges even though both types of payment were provided for in the same agreement and were not segregated within the agreement. Although we find this reasoning unpersuasive, we, in any event, are precluded from applying it to the instant case because of the absence of a lump-sum provision. Because the royalty payments are the essence of the consideration passing to the transferor-taxpayer, their impact on the nature of the transaction is heightened.

We do not suggest that the existence of the royalty payments alone rendered the agreement a license. We do, however, attach significance to the royalty arrangement. The Fifth Circuit in *Moberg, supra,* stated that "[t]he longer the payments are spread out . . ., the more the payments resemble a continuing interest in the earning capacity of the business transferred . . . ." 365 F.2d at 340. In the instant case, the payments were to continue as long as the agreement remained in effect, certainly an extreme example of spread-out payments and indicative of a continuing interest by Sara Lee-U.S. in the earning capacity of the products sold under the "Sara Lee" mark by Sara Lee-Canada. In essence, the royalty arrangement in the instant case gave Sara Lee-U.S. a stake in the transferred rights which is inconsistent with the characteristics of a sale. The rationale was refined in a recent case involving the transfer of the "Vogue" trademark.

In *Conde Nast Publications, Inc. v. United States,* 76–2 U.S.T.C. ¶ 9637 (S.D.N.Y. Aug. 23, 1976), Conde Nast transferred to Butterick the sole and exclusive right and license to use the "Vogue" trademark. In return, Butterick agreed to pay Conde Nast a royalty equal to 1% of all sales of dress patterns. The agreement also included provisions concerning quality control and restraints on alienation. The court held that only the royalty payments that accrued from the sale of patterns under the "Vogue" trademark were to be treated as ordinary income, while the royalties that were attributable to sales of Butterick patterns were to be taxed as capital gain. 76–2 U.S.T.C. ¶ 9637 at 85,016. The rationale apparently is that the royalties tied to the capital asset transferred, the "Vogue" trademark, constituted an interest retained by the transferor sufficient to preclude the finding of a sale. The transferor had no interest in the Butterick patterns and thus could retain no interest. The royalties derived from the sales of Butterick patterns, therefore, could be treated as capital gain. In applying this refinement to the instant case, we must examine the Sara Lee royalty arrangement. The Sara Lee agreement states that the "LICENSEE will pay LICENSOR a royalty upon the net sales of

LICENSEE of products sold by LICENSEE *under the LICENSED MARKS . . . .*" [Emphasis added.] Clearly, the royalties are tied to the transferred capital asset, the "Sara Lee" trademark, and under the logic of *Conde Nast,* should be treated as ordinary income.

We now look to other facts involved in the Sara Lee agreement which lend additional support to our conclusion that the payments under the agreement were ordinary income. The Sara Lee agreement was entitled "LICENSE AGREEMENT," referred to Sara Lee-U.S. as "LICENSOR," referred to Sara Lee-Canada as "LICENSEE," referred to the Sara Lee trademark as the "LICENSED MARK," and referred to the payments as royalties. We do not suggest that nomenclature should be finally determinative of the distinction between a license and a sale. We do, however, afford it some weight as a clue to the parties' intent. *See Oak Manufacturing Co. v. United States,* 301 F.2d 259, 261–62 (7th Cir. 1962).

In *United States v. Wernentin, supra* at 763, the Eighth Circuit emphasized the importance of factors which reflect the parties' intent in distinguishing between a license and a sale. In this regard, we also note Sara Lee-Canada's treatment of the royalty payments it made to Sara Lee-U.S. Sara Lee-Canada deducted these payments as business expenses on its Canadian income tax return. It treated the payments as true royalties and not as the purchase price of a trademark. The result was that one subsidiary of Consolidated Foods, Sara Lee-Canada, treated the agreement as a license, which was the most beneficial tax treatment for it, while another subsidiary of Consolidated Foods, Sara Lee-U.S., treated the agreement as a sale, which was the most beneficial tax treatment for it. Again we do not suggest that the tax treatment of a transaction by a foreign country should primarily control our characterization of the agreement for United States tax purposes, but we do take note of this conduct as reflecting some light upon the intent of the parties.

Finally, various other provisions in the Sara Lee agreement reflect, in our opinion, proprietary restrictions supporting our view that the agreement for the present tax issue purposes cannot be properly regarded as a sale. We have set forth the provisions to which we have referred in this respect as an appendix to this opinion.

We have considered all of the other arguments raised by the appellant and find them to be of no merit, and therefore, to have no effect on our conclusion. Accordingly, the judgment of the district court is

AFFIRMED.

## APPENDIX

1. Provision two of the agreement states:

> LICENSEE agrees to maintain in manufacturing, packaging, labelling, and selling the products in connection with which, pursuant to this Agreement, it uses one or all of the LICENSED MARKS, a standard of quality substantially equal to the quality of the same products now and heretofore sold under the same LICENSED MARKS in the United States of America and elsewhere by LICENSOR. LICENSEE further agrees to permit LICENSOR or its duly appointed agent, at reasonable intervals and during ordinary business hours, to inspect the manufacture and packaging of the products on the premises of LICENSEE, so as to determine whether or not LICENSEE is maintaining said standards of quality; and LICENSOR, or its duly appointed agent, shall be entitled to take samples of said products for testing at such times.

2. Provision three of the agreement states in part:

> LICENSEE agrees to use in Canada, during each calendar year, each of the LICENSED MARKS upon some or all of the products specified in the registration thereof, and to furnish LICENSOR with an annual report showing evidence of such use.

3. Provision six of the agreement states:

LICENSEE will maintain complete and accurate records of all products it manufactures for sale or sells under the LICENSED MARKS. On or before the last day of each month, LICENSEE will deliver to LICENSOR a detailed statement showing the net sales of each product sold under the LICENSED MARKS by LICENSEE during the preceding month. At LICENSOR'S request the statement shall be certified to be accurate by the independent chartered accountants who regularly audit LICENSEE'S books.

4. Provision eight of the agreement states:

LICENSEE will permit LICENSOR and persons designated by LICENSOR to examine or cause to be examined all books and records of LICENSEE at any time and from time to time during regular business hours for the purpose of determining whether LICENSEE is complying with the terms of this Agreement.

5. Provision nine of the agreement states:

LICENSEE agrees that the ownership of the LICENSED MARKS and the goodwill relating thereto, shall always remain vested in LICENSOR, and LICENSEE further agrees never to, directly or indirectly, nor will LICENSEE assist anyone else to, challenge, contest, or call into question the validity or ownership of the LICENSED MARKS or the registrations thereof in Canada or elsewhere or take any action which will impair any rights or [sic] LICENSOR to the LICENSED MARKS.

6. Provision ten of the agreement states in part:

This Agreement and the license granted hereby shall be of perpetual duration.

7. Provision eleven of the agreement states in part:

Upon the rescission or termination of this Agreement or any license granted hereunder, LICENSEE will discontinue the use of LICENSED MARKS. If LICENSEE fails to discontinue such use, LICENSEE will pay a royalty triple that provided for under paragraph 4.

8. Provision twelve of the agreement states:

LICENSOR may, by notice to LICENSEE, terminate this Agreement and any license granted hereunder if a receiver is appointed for LICENSEE or its property, or if LICENSEE becomes insolvent or unable to pay its debts in the ordinary course of business, or if any proceedings are commenced by, for or against LICENSEE under the provisions of any bankruptcy, insolvency, or debtors relief law, or if LICENSEE is liquidated or dissolved, or if LICENSEE defaults in the performance of any other term or condition of this Agreement.

9. Provision thirteen of the agreement states:

Upon termination of this Agreement pursuant to paragraph 12, any royalty payable by LICENSEE to LICENSOR shall become immediately due, and LICENSOR shall be entitled to recover from LICENSEE damages and any loss of profits LICENSOR may sustain as a result of such termination, including, but without limiting the generality of the foregoing, any royalty LICENSOR would have received had this Agreement or any license granted hereunder not been terminated.

10. Provision eighteen of the agreement states in part:

Neither this Agreement nor the rights of LICENSEE hereunder shall be assignable or transferable, either in whole or in part, without the prior written consent of LICENSOR, which LICENSOR will not withhold unreasonably.