EDWARD G. SIROVATKA and BARBARA A. SIROVATKA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sirovatka v. Commissioner
Docket No. 12247-77.
United States Tax Court
T.C. Memo 1983-634; 1983 Tax Ct. Memo LEXIS 160; 47 T.C.M. (CCH) 71; T.C.M. (RIA) 83634; October 12, 1983. *160 John K. O'Connor,Leland E. Hutchinson, and James A. Alexander, for the petitioners. Harmon Dow and Francis J. Emmons, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Additions to tax
Year
Deficiency
Section 6653(a)
1972
$ 6,338.00
1973
$17,056.00
$853.00
1974
$25,911.00
The issues for decision are: (1) Whether petitioner Edward G. Sirovatka's principal payments to Comprehensive Accounting Company (hereinafter CAC) are ordinary and necessary business expenses or capital expenditures; (2) In the event it is determined that those payments are capital expenditures, whether petitioners are entitled to deductions for amortization or depreciation under section 167 [1], and losses under section 165; and (3) Whether petitioners are liable for the addition to tax under section 6653(a) for failure to report prepaid income in the year received. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners resided in Frankfort, Illinois, when they filed their petition herein. *161 During the years in issue Edward G. Sirovatka (hereinafter petitioner) and Barbara A. Sirovatka were husband and wife, and they timely filed their joint Federal income tax returns for 1972, 1973, and 1974 with the Internal Revenue Service Center, Kansas City, Missouri. Petitioners generally computed their taxable income on the cash basis of accounting, but used a hybrid method in 1973. [2] In May 1962, petitioner received his Bachelor of Science Degree in Business Administration from Milliken University, Decatur, Illinois. During 1964, he passed all of the written requirements of the Illinois certified public accountants examination, but he has not been licensed as a certified public accountant. After graduation, petitioner joined the American Oil Company in Chicago, Illinois, where he held various accounting positions from 1962 to 1968. During 1966, while a full-time employee of American Oil Company, petitioner *162 began to prepare income tax returns on a part-time basis. Between 1966 and 1968, petitioner expanded the number of clients for whom he prepared returns from 50 to 300. This practice merely provided petitioner with a supplemental income. No separate office was maintained and all work was performed in petitioner's spare time on evenings and weekends. During June 1968, petitioner left American Oil and signed the first of a series of agreements with Comprehensive Acceptance Corporation, which subsequently changed its name to Comprehensive Accounting Corporation, as a member of the company's Associate Program. [3] Petitioner's status as an associate of CAC, coupled with his payment of all fees and royalties, [4] entitled him to obtain three broad classes of benefits consisting of: (1) the acquisition and servicing of accounts; (2) the receipt of management services; and (3) the receipt of other licenses and privileges. Generally, the Associate Program is a plan under which CAC selects and trains accountants in CAC's systems and procedures, and then builds and expands the associate's practice by delivering a guaranteed minimum number of potential clients (hereinafter accounts) generated *163 by CAC's marketing department on a scheduled basis. The form of the agreements between petitioner and CAC were modified several times during petitioner's association with CAC, but the generall nature of the parties' relationship remained consistent throughout the period. The agreement, whose terms *164 controlled the delivery of accounts at all times relevant herein, is the "Conditional Sales and Licensing Agreement" (hereinafter CSLA), which was executed by petitioner and CAC on September 30, 1971. The CSLA requires CAC to deliver to petitioner a minimum dollar volume of accounts [5] *165 under separate documents entitled "Delivery Schedule" or, in later years, "Supplemental Agreement." The Delivery Schedules and Supplemental Agreements established an approximate dollar volume of accounts to be delivered and the cost to petitioner, [6] as well as the period during which the accounts were to be delivered to and accepted by petitioner. Upon satisfactory completion of delivery and acceptance, the usual practice was for petitioner to enter into a new Delivery Schedule or Supplemental Agreement for additional increments of accounts approximately every other month throughout the years in issue. The parties anticipated an on-going relationship and the continued delivery and acceptance of a minimum of 200 accounts. This expectation was borne out by petitioner's acquisition of a total of approximately 510 accounts delivered under 54 separate contracts between June 1968 and December 1974. [7]
The accounts transferred to petitioner were generated by CAC's marketing organization which obtained leads through direct mail and telephone solicitation of small business owners. All of the initial contracts were cold calls intended to generate sufficient interest in the business owner to allow a salesman to go out and explain the program. When a business owner expressed an interest in receiving more information, a salesman would meet with him and make a standard sales presentation. During the sales presentation, *166 the salesman would describe the details of the services to be performed, including all forms that were to be provided and all information that was required from the business owner. The business owner was further informed that the individuals who performed the work were independent accountants who utilized CAC's data processing facilities, management consulting, and other services. Once the business owner agreed to be serviced by a CAC associate, it was the salesman's duty to obtain a signed client service agreement and a check for the cost of bringing the business owner's records up to date. The service agreement was a nonbinding contract terminable by either party on 30 days' notice. The service agreement specified the work an associate would perform and established the monthly fee to be charged therefor. The fees specified in the client service agreement were established by the salesman in accordance with a CAC publication entitled "Recommended Fee Schedules" which determined the initial monthly fee to be charged by the associate based on the number of checks written by the client per month. The fee agreement specified the charge for regular monthly services, the year-end charge *167 for tax returns, and a one time backwork and installation charge for preparing the client's records for the CAC system. The accounts generated through CAC's marketing system were not procured for any specific associate but were sought to fulfill the need of all associates in the geographic area where the accounts are solicited. Consequently, unless the salesman knew which associate would service a particular business owner, because, for example, the associate was geographically closest to that particular business, the salesman would not tell the business owner the name of the associate who was to perform the work. The salesman would often avoid stating exactly which associate would perform the services because not all associates in the geographic area were actively seeking accounts at any one time.
Once an account was designated as petitioner's, the salesman "installs" it by arranging a meeting between petitioner and the business owner, and delivering to petitioner the signed client service agreement, the client's check, and any client records. At the installation meeting, the salesman's function with respect to an account terminates. It was then petitioner's sole responsibility *168 to develop a working business relationship with the business owner. Following installation, petitioner was given from 10 to 60 days to service the accounts before the closing date specified in the Delivery Schedule or Supplemental Agreement. On the closing date, petitioner received a packet of closing documents from the last contract and a Delivery Schedule or Supplemental Agreement for delivery of an additional increment of accounts during the next 30 to 60 days. [8] At the closing, petitioner was required to accept, reject, or defer each of the accounts tendered by CAC. Once accepted, petitioner obtained the right to service the client and collect fees therefrom, although title to the accounts remained with CAC until petitioner had paid in full the gross sales price with respect to that account. Accounts which were installed shortly before the closing date, or for which petitioner was able to defer his acceptance were carried over to the next closing date and offered to petitioner again. The accounts which petitioner accepted were noted on the schedule of delivered accounts and established petitioner's principal obligation to CAC. Approximately 20 percent of the accepted accounts *169 had previously been serviced by another CAC associate for 8 to 12 months prior to petitioner's acquisition thereof. These previously serviced accounts were available because the associate from whom they were reacquired by CAC had not been properly performing accounting services. Generally, each of the parties treated the transfer of these previously serviced accounts in the same manner as the new accounts generated by CAC's sales department. An associate was allowed to reject tendered accounts under a variety of circumstances including: death of a client, termination of the client's business, fraud, bankruptcy, substantial unpaid taxes, and inability to communicate with the client in English. In addition, accounts could be refused under an unwritten policy where the client worked in a dangerous neighborhood *170 or where petitioner and the client had a personality conflict. Petitioner was obligated to accept delivery of all tendered accounts which did not contain any of the above described infirmities. During the years in issue, petitioner established a reputation for accepting less than all tendered accounts which satisfied these criteria, and on two or three occasions, CAC suspended delivery of accounts to induce him to be more flexible. Petitioner's primary reason for refusing to accept accounts was his concern that they would not be profitable. Petitioner reviewed each account individually, but he did not individually value each account other than to estimate whether the monthly fee would cover his actual costs. [9] *171 Where the monthly fee was too low, petitioner could negotiate a fee increase with the client during the installation period. The parties anticipated that petitioner's business would grow through a combination of account purchases, personal solicitation of new accounts, referrals from accounts being serviced, and fee increases. Excluding account dpurchases, a majority of petitioner's growth, in fact, derived from referrals and fee increases. For petitioner, referrals helped to replace the large number of accounts lost each year through normal attrition, [10] although he lost more monthly fees through dropped accounts than he acquired through referrals. Without annual fee increases petitioner would have sustained annual net losses throughout the years in issue. Between referrals and annual fee increases, however, petitioner was able to increase, as a percentage of gross fees purchased, the size of his practice by 26 percent, *172 28 percent, and 16 percent in 1972, 1973, and 1974, respectively. [11] *173 The consideration petitioner paid for the above described accounts and all other rights received under the CSLA, denominated the Gross Sales Price, was determined by reference to the monthly fees specified in the client service agreement. [12] *174 The Gross Sales Price for each group of accounts was calculated at the closing by multiplying the annual billing for the accepted accounts by 220 percent [13] and adding one-half of the backwork fee charged by petitioner for preparing the accounts for CAC's bookkeeping system. [14] Because the Gross Purchase Price was calculated by reference to the fees established by CAC's salesman in the client service agreement, subsequent fee increases inured solely to petitioner's benefit, while fee decreases and terminations worked solely to petitioner's detriment. Once petitioner accepted an account, he remained liable to pay the Gross Sales Price despite subsequent terminations or fee decreases. In addition to the accounts transferred under the CSLA and associated documents, petitioner also received, in exchange for payment of the Gross Sales Price, numerous other rights which can generally be classified as management services and various licenses and privileges. These other rights were not dependent upon petitioner's continued acceptance of additional increments of accounts, but were derived *175 solely from his status as an associate in good standing. The CSLA placed no time limitation on these other rights, and they could be passed on to petitioner's heirs, executors, administrators, and successors. The management services that petitioner received consisted primarily of monthly seminars and management consulting. [15] As an associate in good standing, petitioner was allowed to attend free monthly seminars which provided CAC with a forum to present new policies and procedures, and to have speakers lecture on topics relevant to the associates' practices. In addition, the seminars provided a regular opportunity for associates to meet and discuss common problems. [16] *176 Throughout the years in issue, the seminars were held monthly, except during the tax season, and petitioner attended all of them. The other significant management service that petitioner received was the right to call upon CAC's management consultants whenever necessary. These management consultants were available to aid petitioner in all phases of his practice and petitioner often used their services in his first year as an associate. Throughout the years in issue, petitioner's practice had become so large that he received special monthly management consulting services from the president and chairman of CAC's board of directors. The other licenses and privileges that petitioner received from CAC consisted primarily of the right to use the company's bookkeeping and accounting system, data processing facility at cost, trademarks and trade names, the right to participate in various group programs for the purchase of goods and services, and other aids. CAC's data processing system was an integral part of the bookkeeping and accounting system which streamlined the processing of client data and provided detailed information to petitioner and CAC regarding each account. Petitioner was allowed to use the data processing facility for a fee that was 10 to *177 50 percent less than that charged by other companies providing comparable services because CAC only charged associates what it cost CAC to provide the data processing service. As an associate in good standing petitioner was allowed to use CAC's trademarks and trade names. Throughout the years in issue, petitioner operated his accounting practice under CAC's tradename, and used the trademark and tradename on his business cards, office letterhead, telephone advertisements, and on the side of his building. The CSLA also granted petitioner a noncompetition agreement which protected his right to service any accounts which he obtained in any manner from competition by CAC or another associate for a period of one year. As a result of his continuous acceptance of additional increments of accounts, petitioner's principal obligations to CAC steadily increased throughout the years in issue. To reduce some of the total principal obligation owed to CAC, in July 1973, petitioner borrowed $350,000 from the Heritage/Pullman Bank and Trust Company (hereinafter Pullman Bank), and liquidated certain installment notes held by CAC and an assignee. Petitioner did not deduct the amount which he repaid *178 to CAC or the assignee with the proceeds of the Pullman Bank loan, but rather deducted his periodic payments of principal and interest to the Pullman Bank in the year of payment in the same manner in which he deducted his payments directly to CAC. The following chart shows the principal and interest payments that petitioner made to CAC and Pullman Bank throughout the years in issue: Year
Interest
Principal
Total Deduction Claimed
1972
$38,511
$28,146
$66,657
1973
40,974
39,425
80,399
1974
67,280
64,971
[17] 132,251 In the notice of deficiency, respondent determined that petitioner could deduct all of the interest charges but that he could only deduct principal to the extent that such amounts represented payments for CAC's share of backwork and installation charges. [18] Respondent denied petitioner deductions for the remaining principal amounts (hereinafter referred to as petitioner's principal payments or principal amounts) because he determined that such amounts did not constitute ordinary and necessary business *179 expenses. Finally, respondent determined that petitioner is liable for the section 6653(a) addition to tax for his failure to report the advance payment that he received during 1973 on his Federal income tax return for that year. [19]
OPINION The primary issue in this case is the proper characterization for tax purposes of the principal payments that petitioner made to CAC. Petitioner contends that the entire principal amount paid during each taxable year in issue represents compensation to CAC for management consulting and marketing services deductible under section 162(a) as an ordinary and necessary business expense. In the alternative, petitioner argues that if the payments are considered to be for the acquisition of customer lists or other capital assets he is entitled to annual amortization deductions under section 167 and to deductions under section 165 for the adjusted basis of accounts lost during the years in issue. Respondent, on the other hand, asserts *180 that petitioner's principal payments to CAC represent the nondeductible acquisition cost of three broad classes of intangible capital assets consisting of client accounts, the unlimited right to receive management consulting and training, the right to use CAC's trademarks, trade names, and other associate rights in perpetuity. Essentially, respondent contends that petitioner's payments to CAC are best characterized as the nondeductible, nonamortizable capital acquisition cost of a fully developed and highly specialized bookkeeping and accounting practice which is delivered through periodic installments of new accounts. For the reasons set forth below, we agree with respondent that petitioner purchased intangible capital assets. We disagree, however, with the tax treatment urged by respondent with respect to the principal payments that petitioner made to acquire those intangible capital assets. It is often difficult to distinguish between a particular expenditure which is currently deductible under section 162(a) and one which is a nondeductible capital expenditure under section 263. Generally, a taxpayer is allowed a deduction under section 162(a) for "all the ordinary and necessary *181 business expenses paid or incurred during the taxable year in carrying on any trade or business * * *." The term "necessary" imposes only the minimal requirement that the expense be "appropriate and helpful" for "the development of the [taxpayer's] trade or business." Welch v. Helvering,290 U.S. 111, 113 (1933). The principal function of the term "ordinary" is to clarify the difference between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset. Commissioner v. Tellier,383 U.S. 687, 689-690 (1966) affg. 342 F. 2d 690 (2d Cir. 1965); Welch v. Helvering,supra.
Generally, the "ordinary" requirement precludes current deduction of capital expenditures which produce assets with useful lives lasting beyond the year of acquisition. Commissioner v. Tellier,supra,Cagle v. Commissioner,539 F. 2d 409 (5th Cir. 1976), affg. 63 T.C. 86 (1974). The mere presence of some possible future benefit is not controlling, but where the payment creates or enhances a separate and distinct additional asset or property interest the payment is capital in nature and not an *182 expense. Commissioner v. Lincoln Savings & Loan Association,403 U.S. 345 (1971), revg. 422 F. 2d 90 (9th Cir. 1970), revg. 51 T.C. 82 (1968); Florida Publishing Co. v. Commissioner,64 T.C. 269 (1975), affd. per curiam 552 F. 2d 367 (5th Cir. 1977). It is clear that petitioner's payments to CAC created separate and distinct capital assets. Reduced to the essentials, petitioner's payments were made to obtain a list of approximately 500 potential client names delivered only a period of six years, the right to receive management consulting for as long as he remained an associate in good standing, and the right to use all other rights granted to CAC associates including use of trademarks, trade names, and the bookkeeping and accounting system. The client list is clearly a capital asset whose acquisition cost is not deductible as a business expense. Manhattan Co. of Virginia, Inc. v. Commissioner,50 T.C. 78, 86 (1968); Boe v. Commissioner,35 T.C. 720 (1961), affd. 307 F. 2d 339 (9th Cir. 1962). [20] The fact that the list was acquired over a period of years does not alter the fundamental capital nature of the asset. What is significant is that the evidence established that the customer *183 lists had a useful life to petitioner substantially in excess of one year. Commissioner v. Lincoln Savings & Loan Association,supra.The acquisition cost of this asset must therefore be capitalized and amortized over its useful life. Commissioner v. Tellier,supra.
Petitioner's reliance on cases such as Iowa-Des Moines National Bank v. Commissioner,68 T.C. 872 (1977), affd. 592 F. 2d 433 (8th Cir. 1979), to support the deductibility of the principal payments is misplaced. The decision in Iowa-Des Moines National Bank was clearly predicated on the determination that the payments therein merely extended an aspect of the bank's existing business and did not create or enhance a separate and distinct asset or property interest. Moreover, the payments involved recurring expenditures common in the banking business. In the instant case, petitioner's expenditures did not merely extend petitioner's existing tax preparation business; instead, they allowed petitioner to establish an entirely new bookkeeping business while creating, inter alia, a separate and distinct capital asset in the form of a potential client *184 list. Such expenditures are clearly not common or recurring in the accounting business. The portion of petitioner's principal payments allocable to the management consulting and associate rights likewise created assets or property interests with useful lives to petitioner substantially in excess of one year. Under the terms of his agreement with CAC, petitioner obtained the right to call upon CAC to perform management services and to use the associate rights for as long as he remained an associate in good standing. The CSLA placed no time limitations on these rights, and we think it is significant that they could be passed on to petitioner's heirs, executors, administrators, and successors. Moreover, those rights were applicable to both the accounts transferred to petitioner under the contracts as well as to any accounts received by petitioner through referrals or by his own solicitation. Most importantly, these rights were available to petitioner solely because of his status as an associate in good standing, and were in no way dependent on his continued acquisition of accounts. Therefore, once petitioner had acquired the 200 accounts contemplated by the parties he was always *185 able to use CAC's trademarks, trade names, and copyrighted materials, and to obtain management consulting without additional expenditures. Clearly, therefore, CAC's service obligations to petitioner were both temporally and quantitatively unlimited. As with the client list, the portion of the principal allocable to these prepaid service and license expenses must be capitalized because the assets or rights created have useful lives extending substantially beyond the close of the tax year. Commissioner v. Lincoln Savings & Loan Association,supra;United States v. Akin,248 F. 2d 742 (10th Cir. 1957), cert. denied 355 U.S. 956 (1958). Petitioner did not allocate any amount between the client list, management services, and other rights that he obtained in exchange for his principal payments on the belief that they represented fully deductible expenses under section 162(a). Since we have held that petitioner has acquired three capital assets, an allocation of the purchase price is necessary because different tax consequences can attach to the payment for different items. Commissioner v. Seaboard Finance Co.,367 F. 2d 646, 649 (9th Cir. 1966), affg. a Memorandum Opinion of this Court; *186 Commissioner v. Ferrer,304 F. 2d 125, 135 (2d Cir. 1962) modifying 35 T.C. 617 (1961). Mere difficulty in making this allocation does not justify failure to segregate a composite price between assets with different tax characteristics. See Manhattan Co. of Virginia, Inc. v. Commissioner,supra at 91-93, and cases cited therein. Among the three assets purchased, the client list is without question the most important, and one for which the largest portion of the principal payments were made. The client list represents the primary source of potential income with which petitioner can discharge his principal obligations to CAC. Each of the individuals on the list desired to receive accounting services and, while petitioner bore the burden of establishing a working relationship with these individuals, it was likely that they would in fact utilize petitioner's services and thereby generate income for petitioner. Moreover, when petitioner performed well, these clients were a good source of referrals from which petitioner could generate new accounts to replace those lost through normal attrition. Further evidence of the importance of the potential client list to both petitioner and CAC *187 is suggested by the parties' actions with respect thereto. When CAC was displeased with petitioner's refusal to accept all accounts transferred, they stopped delivery of accounts in an effort to induce him to be more cooperative. Clearly, CAC believed they were withholding a valuable commodity that would induce petitioner to be more cooperative and CAC apparently achieved its intended result. Finally, as petitioner's experience grew his need for management services diminished, [21] but he continued to make regular purchases of client accounts. Based on this evidence, we believe that 80 percent of petitioner's total principal payments were made to acquire the potential client list, and the remaining 20 percent was paid for management services and other associate rights and privileges. Petitioner argues that the portion of the purchase price allocable to the acquisition of the client list is amortizable over its *188 useful life. Respondent contends that the customer list is not amortizable because it constitutes an "indivisible" or "mass" asset which is inseparable from goodwill. Section 167(a) permits a deduction of a reasonable allowance for the exhaustion, wear and tear, and obsolescence of intangible property used in a taxpayer's trade or business. The term property includes intangibles, for which the rules for the allowance of a depreciation deduction are set forth in section 1.167(a)-3, Income Tax Regs.: If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * * To qualify for an amortization deduction, *189 petitioners must show that the client list: (1) has a limited useful life, the duration of which can be determined with reasonable accuracy, and (2) has an ascertainable cost basis separate and distinct from goodwill, going concern value, or other nondepreciable value. The issues to be decided are essentially factual. Houston Chronicle Publishing Co. v. United States,481 F. 2d 1240 (5th Cir. 1973), cert. denied 414 U.S. 1129 (1974); Commonwealth v. Seaboard Finance Co.,supra.
In acquiring the list of potential client names petitioner was afforded the opportunity to develop an ongoing relationship with small and medium size business owners interested in receiving accounting services. When an account chose to terminate his relationship, petitioner suffered a diminution in the value of the intangible asset which he had acquired. An account could terminate petitioner's services for any reason on 30 days' notice, and the record establishes that a large number of accounts petitioner obtained from CAC so terminated his services. Between June 1968 to December 1974, petitioner acquired approximately 510 accounts from CAC. As of December 1974, he was still servicing only 224 of these *190 original accounts, clearly demonstrating that the potential client list is a wasting asset. Petitioner presented expert testimony that the accounts purchased had an average expected useful life of approximately 4.9 years. This testimony was based on petitioner's own loss experience which showed that approximately 50 percent of all CAC generated accounts dropped within two years of the date transferred to petitioner and approximately 75 percent dropped within six years of the transfer date. Comparisons with other associates' loss experience resulted in similar loss ratios. Respondent challenged the accuracy of the projected useful life determined by petitioner's expert. [22] Significantly, however, respondent's analysis of the same figures resulted in an expected useful life of approximately 3.9 years. The appropriate standard is whether the useful life of the asset may be estimated with reasonable accuracy. Section 1.167(a)-3, Income Tax Regs.; Super Food Services, Inc. v. United States,416 F. 2d 1236 (7th Cir. 1969). Extreme exactitude is not a paradigm the law requires. Houston Chronicle Publishing Co. v. United States,supra.We hold that the useful life of the potential *191 client list is susceptible to estimation with reasonable accuracy and that the useful life to petitioner is 4.5 years. Respondent argues that the customer list constitutes a mass asset for which amortization is unavailable because petitioner has failed to prove that it has an ascertainable value separate and distinct from goodwill or going concern value. We disagree. The mass asset theory is designed to prevent a taxpayer from amortizing an intangible asset whose primary value consists of goodwill or going concern value. Manhattan Co. of Virginia, Inc. v. Commissioner,supra.Where, as here, the customer list has an *192 ascertainable value separate and distinct from goodwill or going concern value, amortization is allowed for the portion of the purchase price allocable to the wasting asset. Manhattan Co. of Virginia, Inc. v. Commissioner,supra;Computing & Software, Inc. v. Commissioner,64 T.C. 223, 232 (1975). The essence of goodwill is a preexisting business relationship, based on a continuous course of dealing which may be expected to continue indefinitely. Computing & Software, Inc. v. Commissioner,supra at 233. The evidence established that CAC never performed accounting services for the potential accounts transferred to petitioner, and consequently petitioner could not have obtained an expectancy of continued customer patronage.[23] *193 To the contrary, it was incumbent upon petitioner to establish a working relationship with a potential client who could terminate the relationship on 30 days' notice. With no goodwill from a preexisting business relationship on which to build, success or failure depended almost entirely on petitioner's own efforts. [24] *194 Nor, as respondent contends, does the convenant not to compete granted to petitioner by CAC suggest, on these facts, that goodwill was transferred. CAC was not in a position to compete with petitioner for the performance of accounting services. The evidence conclusively establishes that CAC's operation was geared exclusively toward providing accounts and training to associates and as such it did not have the organization necessary to perform accounting services in competition with petitioner. To the extent that petitioner received the right to referrals and other nondepreciable elements of the client list, including the expectation that a large number of potential clients would utilize petitioner's services, an allocation must be made to the nonamortizable elements present in the customer list. Manhattan Co. of Virginia, Inc. v. Commissioner,supra at 91.Upon consideration of the record herein, we find that there is sufficient evidence to permit an allocation of 15 percent of the purchase price to the continuing value of the list. Petitioner may, therefore, amortize the remaining 85 percent of the purchase price of the potential *195 customer list [25] over the 4.5 year useful life of the list. We have determined that 20 percent of petitioner's total principal payments were paid for management services and other associate rights and privileges. Between these two assets, we believe that the associate rights were of greater continuing value to petitioner and that they were obtained for a greater purchase price than were the management services. As petitioner gained experience, his need for management services decreased. For example, throughout the years in issue, petitioner, rather than receiving management services at the monthly seminars, helped CAC provide training to new associates. [26] In addition, petitioner was Chairman of the Committee responsible for updating CAC's procedural manual, a position which clearly indicates that petitioner was knowledgeable and experienced at running an associate practice. In contract, petitioner's need for the other associate rights *196 did not diminish through time, but, if anything, became more valuable as petitioner's practice expanded. Petitioner's use of CAC's bookkeeping and accounting system was essential to the successful operation of petitioner's practice. The specialized forms and procedures that comprised the system allowed petitioner to service accounts properly and efficiently, and his need to use the system would continue for as long as he remained a CAC associate. Moreover, as petitioner's practice increased, he obtained an increased economic benefit from using CAC's data processing facility at cost. On these facts, we find that 7 percent of petitioner's total principal payments was paid to acquire management services and 13 percent was paid to acquire the other associated rights. The 7 percent of petitioner's principal payments paid in exchange for management services constitute prepaid expenses. Under the CSLA, CAC's obligation to perform management services was unlimited both as to the length of time covered by the agreement, and to the amount of services to be rendered in any given year. Generally, prepaid expenses may not be deducted in the year paid where the expenditure results in the *197 creation of an asset having a useful life which extends substantially beyond the close of the taxable year. Section 1.461-1(a)(1), Income Tax Regs. Where such an asset has an ascertainable useful life, the duration of which can be determined with reasonable accuracy, the cost may be allocated over such useful life. E.g., Commissioner v. Boylston Market Ass'n.,131 F. 2d 966 (1st Cir. 1942), affg. a Memorandum Opinion of the Board of Tax Appeals (prepaid insurance premiums); University Properties, Inc. v. Commissioner,45 T.C. 416 (1966), affd. 378 F. 2d 83 (9th Cir. 1967) (prepaid interest); Sandor v. Commissioner,62 T.C. 469 (1974), affd. 536 F. 2d 874 (9th Cir. 1976) (prepaid interest). [27] However, prepayments that arise with respect to the rendition of services do not easily lend themselves to allocation. In this case, there was no limit to the amount of services CAC had to provide in any given year, and petitioner was free *198 to call upon CAC for an indefinite period. Thus, petitioner obtained an asset with an indeterminable useful life. [28] With no ascertainable period over which to allocate this expense, petitioner must capitalize the cost of the management services and recoup it when he disposes of his practice. Similarly, the 13 percent of petitioner's principal payments allocable to the cost of his other licenses and privileges constitutes an expenditure for the acquisition of an asset with an unlimited useful life which must be capitalized. Since there is no ascertainable period over which to allocate this expense, petitioner is not entitled to annual deductions with respect to this expense. [29] *199 Petitioner next contends that he should be allowed a deduction *200 under section 165 for the accounts lost during the years in issue. Respondent's position is that the client list is a mass asset whose individual accounts were not individually valued and for which no loss deduction is allowable. The general rule is that taxpayers are not entitled to loss deductions for termination of individual accounts which together constitute a mass asset. Sunset Fuel Co. v. United States,519 F. 2d 781 (9th Cir. 1975). Two interrelated reasons dictate such treatment: (1) the goodwill inherent in a mass asset is not lost by the termination of individual accounts; and (2) the nature of mass assets is such that individual accounts cannot be individually valued, and no basis has been established on which a deduction may be claimed. Sunset Fuel Co. v. United States,supra at 783-784; section 1.165-1(c), Income Tax Regs. Where, as here, the taxpayer has been able to segregate out the value of the goodwill he must still prove the portion of the total purchase price allocable to the individual accounts. We believe the accounts were not individually valued so as to allow petitioner a section 165 loss deduction. In fact, individual valuation of the accounts was not *201 possible as the parties had to resort to a standard multiple of the annual billing to determine the purchase price of the accounts. As CAC stated with respect to the transferred accounts: The Associate should look on these accounts as a part of a practice, and not as individual accounts. It should be understood that within a practice the quality of each account will vary -- some will be excellent, some will be good and some will be marginal. It is an impossible task to judge with absolute certainty what category any particular account falls into, whether it be at the time of installation or upon formal acceptance. * * * [But] the Associate has a right to expect that most of the accounts will be of average quality and that those accounts that are marginal will be averaged out by those that are excellent. Clearly, under these circumstances, the parties' use of a standard multiple to establish the cost of the purchased accounts does not constitute individual valuation because it is arbitrary and merely averages out the peculiarities of individual accounts. [30] *202 Sunset Fuel Co. v. United States,supra.
Finally, we must determine whether petitioner is liable for the section 6653(a) addition to tax for his failure to include in his income for 1973 the advance payments which he received in that year for work to be performed in 1974. Petitioner has conceded that those payments are properly includable in his 1973 *203 gross income, but he contests the imposition of the section 6653(a) addition to tax. In computing taxable income, petitioner, as a cash basis taxpayer, must include all items of income for the taxable year in which they are actually or constructively received. Section 1.446-1(c)(1), Income Tax Regs. That the payments are for future services does not alter the requirement that they be included in income when received. See Miele v. Commissioner,72 T.C. 284 (1979); Beaver v. Commissioner,55 T.C. 85 (1970). Petitioner bears the burden of proof that any underpayment of tax was not due to negligence. Enoch v. Commissioner,57 T.C. 781 (1972). Petitioner offered no evidence on this issue. Consequently, we sustain respondent's determination with respect to this issue. To reflect the foregoing, Decision will be entered under Rule 155
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. During 1973, petitioner treated advance payments from clients for year end services as "deferred income" which he did not include in income in either 1973 or 1974. Petitioner has not contested respondent's adjustment of petitioner's 1973 gross income to include these payments.↩
3. For convenience, we will refer to Comprehensive Accounting Corporation and its predecessors simply as CAC. Comprehensive Accounting Corporation is the indirect successor in interest to Leo G. Lauzen & Company, a sole proprietorship which was incorporated in Illinois in September 1956, to provide bookkeeping, accounting, and tax services to small and medium size businesses. Through a series of mergers and incorporations not relevant herein, Leo G. Lauzen & Company, and its successors, were merged into a Delaware Corporation, Comprehensive Accounting Service Corporation, whose name was subsequently changed to Comprehensive Accounting Corporation (CAC). At all relevant times, Leo G. Lauzen was the sole shareholder and Chairman of the Board of Directors of CAC. The parties have stipulated that petitioner is not, and never has been an officer, director, or employee of CAC. ↩
4. See n. 11.↩
5. Typically, petitioner accepted delivery of a greater dollar volume of accounts than was called for under the contract of delivery. The additional accounts were delivered under the terms of a General Release which relieved CAC from any liability associated with the delivery of accounts under the CSLA and associated contracts for delivery, and granted petitioner a discount for the large purchase. 6. Petitioner was granted discounts from the stated price for waiving the death and bankruptcy guarantee and releasing CAC from any liability with regard to the transferred accounts. ↩
7. Of the 510 accounts that petitioner acquired, approximately 190 were acquired between February 1973 and December 1974.↩
8. The closing documents included a schedule of accounts delivered, a computation of the gross sales price, a general release (under which petitioner received increments of accounts in excess of the value guaranteed in the delivery schedule), and an installment collateral note. Later closing documents also included a waiver of defenses form and a Security Agreement - Installment Note.↩
9. Individual valuation of these accounts was probably not possible. As CAC stated with respect to these accounts: The Associate should look on these accounts as a part of a practice, and not as individual accounts. It should be understood that within a practice the quality of each account will vary -- some will be excellent, some will be good and some will be marginal. It is an impossible task to judge with absolute certainty what category any particular account falls into, whether it be at the time of installation or upon formal acceptance. * * * [But] the Associate has a right to expect that most of the accounts will be of average quality and that those accounts that are marginal will be averaged out by those that are excellent.↩
10. Because petitioner worked with medium and small businesses, many accounts were lost when the client went out of business, died, moved away, or sold his business. As of December 31, 1974, petitioner was only servicing 224 of the 510 accounts originally acquired from CAC. ↩
11. These figures are for the 12-month periods ending on October 31 of each year. The following chart provides a summary of the effect of total fee increases, total referral fees, fees lost from dropped accounts, and fee decreases for the 12-month periods of which CAC maintained its recording for the period under consideration: 12-Month Period Ended
10/31/72
10/31/73
10/31/74
Client Monthly Fees
$17,721 $25,906 $29,170 Less: Gross Fees
Purchased
14,037 20,176 25,148 Growth Factor
3,684 5,730 4,022 Fee Increases
4,379 6,275 11,672 Referral Fees
9,208 12,622 16,541 Discounts - General
Release A special fee discount was allowed for certain large accounts in computing the total purchase price under the agreements.
*↩
1,210 1,477 1,628 Subtotal
14,797 20,374 29,841 Less: Drops
(10,897)
(14,326)
(24,870)
Less: Fee Decreases
(216)
(318)
(949)
Growth Factor
$ 3,684 $ 5,730 $4,022 Growth As Percentage of
Gross Fees Purchased
26.2% 28.4% 16.0% 12. In addition to the Gross Sales Price, the CSLA recited that petitioner was required to pay a $2,000 nonrefundable licensing fee and a "royalty" of 5 percent of the Gross Sales Price. CAC waived the licensing fee because petitioner had been an associate in good standing for several years prior to the time that the CSLA was executed.Petitioner became obligated to pay the 5 percent royalty in the month following the final scheduled payment of each note evidencing petitioner's obligation to CAC and continually thereafter for a period of 10 years. Petitioner was not required to make any royalty payments throughout the years in issue.
13. During the years in issue, the multiplier was increased from 220 to 235.3 percent in May 1972, and again from 235.3 to 242 percent in April 1973. ↩
14. This figure was subject to separate discounts for large purchasers and a waiver of CAC's replacement guarantee for accounts lost during the first two years following delivery because of death or bankruptcy of the owner.↩
15. Other management services included training programs for both petitioner and his staff and various office organization and marketing aids, including public relations assistance. ↩
16. Often, petitioner served as a moderator of various discussion groups that explored the problems of running an associate practice. In addition, throughout the years in issue, petitioner was chairman of the committee responsible for updating CAC's procedure manual.
17. The amount claimed on petitioner's return for 1974 is $132,250.29, however we rely on the figures stated in the stipulation of facts. Rule 91(e), Tax Court Rules of Practice and Procedure.↩
18. Respondent determined that petitioner could deduct $1,256, $10,202, and $55, of his principal payments representing CAC's share of backwork and installation charges in 1972, 1973, and 1974, respectively.↩
19. See n. 2, supra.↩
20. See Midlantic National Bank/Merchants v. Commissioner,T.C. Memo. 1983-581↩.
21. In fact, throughout the years in issue, petitioner became involved in the training of other associates as a moderator of numerous discussion groups held during the monthly seminars and as chairman of the committee responsible for updating CAC's forms and procedure manual.↩
22. Respondent also contends that petitioner's expert's report is inaccurate and legally impermissible because the expert considered petitioner's loss experience for years subsequent to those in issue. We have found that petitioner's loss experience throughout the years in issue was comparable to that suggested by petitioner's expert. We find it significant that as of December 31, 1974, petitioner retained only 224 of 510 accounts purchased over the preceding six years when approximately 190 of the 510 accounts had been purchased less than two years prior to that date.↩
23. For the same reasons there was no going concern value transferred. Going concern value is the ability of an acquired business to generate sales without any interruption because of a takeover. Winn-Dixie Montgomery, Inc. v. United States,444 F. 2d 677, 685, n. 12 (5th Cir. 1971). Since petitioner did not acquire a going business there could be no going concern value. See Solitron Devices, Inc. v. Commissioner,80 T.C. 1, 19-20↩ (1983), on appeal (11th Cir., April 8, 1983). 24. As to the clients that had previously seen serviced by another CAC associate, we find that the expectancy of continued customer patronage, while not entirely lacking, was an insignificant part of the value of these accounts. All of the previously serviced accounts had become available for transfer to petitioner because either the associate had not properly performed his job and the accounts had been repossessed by CAC, or the associate had decided to sell his practice. In either case, the accounts typically had only been serviced for a period of 8 to 12 months, and there was no significant continuous course of dealings on which an expectancy of continued patronage could arise. Moreover, in those cases where the accounts had been repossessed due to improper service, there was of necessity little goodwill, and it was primarily petitioner's personal efforts that resulted in the client utilizing his services.
25. The acquisition cost of the potential customer list is 80 percent of petitioner's total principal payments.↩
26. At CAC's monthly seminars, petitioner moderated various discussion groups that addressed the problems of running an associate practice.↩
27. In light of our conclusion that CAC's obligation to perform management services was unlimited, we need not consider whether we agree with the one-year rule enumerated in Zaninovich v. Commissioner,616 F. 2d 429 (9th Cir. 1980), revg. 69 T.C. 605↩ (1979).
28. Under his agreement petitioner could call upon CAC to provide management services for the duration of petitioner's lifetime. Moreover, the services were available for both CAC generated accounts and referrals, and they were not dependent upon continued purchases of accounts.↩
29. On brief, petitioner argued that these other licenses and privileges constituted franchise rights and that the portion of petitioner's principal payments allocable thereto were deductible in full in the year paid citing to decisions rendered by this Court in cases such as Moberg v. Commissioner,35 T.C. 773 (1961), affd. in part revd. in part, and remd. 310 F. 2d 782 (9th Cir. 1962) and revd. and remanded 305 F. 2d 800 (5th Cir. 1962); and Dairy Queen of Oklahoma v. Commissioner,26 T.C. 61 (1956), revd. and remd. 250 F. 2d 503 (10th Cir. 1957), which were decided prior to the enactment of section 1253. We note that those decisions concerned the tax consequences to the transferor-franchisor. Further, the parties agree that section 1253 is not applicable in the instant case because it only applies to transfers of franchise rights occurring after December 31, 1969, whereas petitioner entered into his first agreement with CAC in June 1968. See Consolidated Foods Corp. v. United States,569 F. 2d 436↩ (7th Cir. 1978). Regardless of the nomenclature used to describe these payments, however, they constituted prepaid expenses by the transferee-petitioner herein for rights which have an unlimited useful life. Since there is no period over which they may reasonably be allocated, petitioner must capitalize them and deduct them in full when he sells his practice.
30. In sum, we conclude that petitioner's total principal payments must be allocated 80 percent to the client list, 7 percent to the prepaid management services, and 13 percent to the other prepaid associate rights and privileges. Of the total amount allocated to the client list (80 percent of the total disallowed principal payment), we conclude that 85 percent may be amortized over a useful life of 4.5 years (i.e., 68 percent of the total principal payments may be amortized over 4.5 years). The remaining 15 percent of the amount allocated to the client list is nonamortizable (i.e., 12 percent of the total principal payments is nonamortizable). Petitioner is not entitled to a loss deduction when an account drops his services. All of the principal payments allocated to the prepaid management services and other prepaid associate rights (i.e., 20 percent of petitioner's total principal payments) must be capitalized, and no part may be amortized over any period.