**Judy DEVINE, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 75–3979.

United States Court of Appeals, Fifth Circuit.

Sept. 2, 1977.

---

Ronald G. Williams, Ronald M. Mankoff, Dallas, Tex., for petitioner-appellant.

Scott P. Crampton, Asst. Atty. Gen., Michael L. Paup, Daniel F. Ross, Attys., Gilbert Andrews, Acting Chief, Appellate Section, U. S. Dept. of Justice, Mary L. Jennings, Atty., Tax Div., Meade Whitaker, Chief Counsel, I.R.S., Washington, D. C., for respondent-appellee.

Before THORNBERRY and GEE, Circuit Judges, and Markey,* Chief Judge.

MARKEY, Chief Judge:

Appeal from a memorandum decision of the United States Tax Court, 34 T.C.M. (CCH) 1077 (1975), upholding income tax deficiencies levied upon taxpayer Judy Devine for 1965–67. Jurisdiction is under I.R.C. § 7482.[1] We affirm.

## Background

The Tax Court made extensive findings of fact, the material portions being:

Judy Devine is a single individual * * *. She and her former husband, Thomas J. Devine, filed * * * joint Federal income tax returns for the taxable years 1965, 1966 and 1967 * * *. [Judy] * * and Thomas J. Devine were subsequently divorced.

The income tax deficiencies determined by [the Commissioner] * * * are based solely upon amounts received by * * * Thomas J. Devine, in the conduct of his business during the years in issue.

During 1965 and 1966, Thomas J. Devine (* * * Devine) entered into a partnership with Frederick N. Montalvo (* * * Montalvo) known as the Southern Icee Company [Southern] * * * in Baton Rouge, Louisiana. When organized, the partnership received franchise rights to a product known as "Icee," * * * a frozen carbonated beverage produced by combining ice, syrup and carbon dioxide by means of a special Icee dispenser machine. The franchise rights were obtained from the John E. Mitchell Company, Inc. (* *

Mitchell), manufacturer of * * * machines which dispensed the Icee product * * *.

Devine became interested in the Icee Product in 1964 * * *. Mitchell had been having problems selling its Icee machines in South Texas * * *. With Mitchell's permission, Devine and Montalvo initiated a very successful system in South Texas to remedy the [maintenance] problem, whereby regular maintenance would be provided a lessee or purchaser of an Icee machine in return for specified royalties. Later, because the franchise rights to South Texas were already granted to another person, Devine and Montalvo requested Mitchell to grant them Icee franchise rights in another geographical area.

By February 1, 1965, Mitchell [had] granted Devine and Montalvo Icee franchise rights to Louisiana, Mississippi, Alabama and parts of Florida. After June 1, 1965, they also acquired Icee franchise rights to southeastern Texas, the remainder of Florida and all of South Carolina.

These Icee franchise rights were only valuable to Devine and Montalvo after territories had been "worked up" into a current market for Icee products. After working up an area, Devine and Montalvo would then sell their rights to subdevelopers who in turn would geographically divide up their franchise rights and sell areas to retailers of the Icee product. Thus, different contracts were prepared to reflect (1) the original agreement between Mitchell and the partnership of Devine and Montalvo, (2) the partnership's agreement with various subdevelopers and (3) retailers' agreements. In most instances, each contract merely

---

* Of the U.S. Court of Customs and Patent Appeals, sitting by designation.

1. § 7482 in pertinent part provides:
   (a) Jurisdiction.
      The United States Courts of Appeals shall have exclusive jurisdiction to review the decisions of the Tax Court, except as provided in section 1254 of Title 28 of the United States Code, in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury; and the judgment of any such court shall be final, except that it shall be subject to review by

the Supreme Court of the United States upon certiorari, in the manner provided in section 1254 of Title 28 of the United States Code.
   (b) Venue.—
   (1) In general.—Except as otherwise provided in paragraph (2), such decisions may be reviewed by the United States court of appeals for the circuit in which it is located—
   (A) in the case of a petitioner seeking redetermination of tax liability other than a corporation, the legal residence of the petitioner,

   *   *   *   *   *   *

traced the original agreement which the partnership had with Mitchell adding few obligations for the subdevelopers and retailers that were not required by Mitchell of the partnership.

The partnership began its operation by leasing Icee equipment to retail outlets in Baton Rouge, Louisiana in early 1965. Icee equipment was obtained by Devine and Montalvo from Mitchell through either lease or purchase. Under its agreement with Mitchell, the partnership was required to purchase or lease 50 Icee dispenser machines during its first year of operation and 75 machines per year thereafter. If such purchases were not made in this quantity, Mitchell had the right to terminate its agreement by giving the partnership 60 days written notice.

Other restrictions and obligations were imposed on the partnership. It was allowed to sublease or resell Icee dispenser machines but was required to keep them in good running condition. Any movement or sale of a "leased" Icee dispenser required the express prior permission of Mitchell. The partnership could neither assign nor transfer its own contract with Mitchell without express permission. The partnership and any sublessees were forbidden to hold themselves out as owners of leased Icee machines. Mitchell was to be held harmless from any claim arising from injury to persons or property by use of an Icee dispenser, for which the partnership was required to hold adequate liability insurance.

Devine and Montalvo were permitted to establish subagencies whereby third persons were granted the right to purchase, distribute and service Icee dispensers to ultimate retailers in their geographical franchise areas. At the same time, the partnership could, and did, set up and operate its own retail outlets for Icee products.

In a typical situation, the partnership would execute a "Sales Sub-Agency Agreement" when transferring the exclusive right to sublease or rent Icee dispensers within a stated territory to subdevelopers. The word "exclusive" was used in contracts with subdevelopers because persons buying these rights paid a lump-sum franchise fee and wanted assurance that a third party would not bring Icee machines into their area. The purchasers wanted and insisted upon exclusive rights within the geographical area encompassed by their franchise.

Under its Sub-Agency contracts, the partnerships agreed to supply the subagent with sufficient Icee cups and to warrant equipment for defects through its warranty from Mitchell, while retaining the right to approve the type of syrups used by the subagent in any dispenser.

In return for these services by the partnership, each subdeveloper agreed as subagent to pay a lump-sum franchise fee, an additional payment of $350 for installation of the Icee dispenser, plus monthly rentals of $64 for each machine used. In addition, a subdeveloper agreed to purchase all Icee cups from the partnership; to lease not more than 20 Icee dispensers annually; to keep all machines maintained and in good running condition; to use the Icee name only in connection with Icee products; not to transfer the contract without express written permission; to pay all taxes and fees where required to operate; and to hold the partnership harmless from any liability to persons or property from the use of any Icee dispenser.

The partnership had the right to cancel its Sub-Agency agreement with any subdeveloper if (1) the subagent did not lease the required number of dispensers each year, (2) if monthly rental payments were in arrears, (3) if Icee cups were not used by the subagent when provided by the partnership, or (4) if any other material term of the contract was violated.

When the partnership franchise rights were extended to all of Florida and all of South Carolina on June 1, 1965, Devine and Montalvo also agreed for the first time to give Mitchell 20 percent of the proceeds from the sale of any subfranchise in those states.

On October 14, 1965, a new agreement was entered into with Mitchell granting the partnership additional franchise rights in

Icee equipment for most of the remaining geographical United States. This new contract referred to Devine and Montalvo as "developers" and it superseded all prior agreements between the partnership and Mitchell.

Under the October 14, 1965 agreement, the partnership now was authorized by Mitchell to develop and maintain all leasing and servicing of Icee dispensers in enumerated geographical areas. However, all Icee dispensers were only to be leased in the future rather than sold outright. Any agreement made by the partnership with a prospective retailer would have to be first approved by Mitchell. If so approved, a retailer would pay $400 to the partnership which would retain $50 and forward the remaining $350 to Mitchell. The partnership was required to pay Mitchell a rental of $54 per month for any Icee dispenser operated in its territory, whether or not it was being leased to a third party. * * *

The partnership agreed to rent at least 600 Icee dispensers during each calendar year and if this did not occur, Mitchell had the right to cancel the agreement with 60 days written notice. The annual quota of 600 machines ceased after the partnership rented a total of 20,000 such machines.

Despite any subsidiary agreements with its subdevelopers, the partnership remained personally liable for carrying out the terms of its agreement with Mitchell.

The lump-sum payments by subdevelopers were to be remitted first to Mitchell and placed in an escrow account until the subdeveloper had leased a minimum of 10 Icee dispensers to retailers in his or her designated territory. When ten machines were ordered, Mitchell would then release one-half of the escrow balance to the partnership and retain the other half.

The partnership was required to pay Mitchell a royalty of one-fourth cent per cup of Icee dispensed in its own territories, whereas subdevelopers were required to pay only one-eighth cent royalty per cup dispensed in their areas. The difference was structured to make retention of territories by the partnership less attractive since Mitchell profited well from the sale of franchise rights to subdevelopers. In return for such royalties, retailers were entitled to use Mitchell's Icee trademark on all cups and dispensing machines, as well as promotional literature and advertising associated with such trademark.

*       *       *       *       *       *

The partnership agreed to canvass diligently for retailers, to promote and maintain leases, and to service all its dispensers. It was responsible for supervising retailers by giving them sufficient directions and instructions to abide by the Icee Retailer's Agreement approved by Mitchell. Any breach of a Retailer's Agreement detected by the partnership was to be reported to Mitchell.

*       *       *       *       *       *

The net effect of this new contract was that in return for expanded geographical franchise rights, Devine and Montalvo relinquished their rights to sell Icee dispenser machines outright after October 14, 1965, and agreed to divide the proceeds from all future subfranchising equally with Mitchell.

On January 31, 1966, the territory of Arizona was added to those enumerated in the October 14, 1965, agreement. On March 11, 1966, Mitchell, Devine and Montalvo entered into an agreement whereby the territories referred to in the October 14, 1965 agreement were divided equally between Devine and Montalvo. All other pertinent provisions of the October 14, 1965 agreement remained in effect after this termination of the original partnership between Devine and Montalvo on March 11, 1966.

*       *       *       *       *       *

* * * Thereafter, * * * contracts were made with each subdeveloper by Devine or Montalvo separately. Devine would enter into Sale and Supply Agreements with subdevelopers in his own territories either personally or through his wholly owned corporation and appointed agent, the National Icee Corporation.

*       *       *       *       *       *

Each [subdeveloper and retailer] contract or agreement * * * involved Mitchell as a party to a greater or lesser degree, but in all of them the rights of the parties were set forth in conformity with ongoing, concurrent obligations to Mitchell from Devine, Montalvo, subdevelopers and retailers. Thus, Devine and Montalvo were primarily responsible to Mitchell for disposition of their franchise rights, operation of Icee equipment and dispensing of the Icee product. Similarly, subdevelopers and retailers were bound to perform the essential terms of the Devine-Montalvo agreement with Mitchell indirectly through their own contracts with the partners, or directly through a Retailer's Agreement with Mitchell.

The following table indicates the gains realized by Devine during the years in issue from his share of lump-sum franchise fee payments for transfers of territories to subdevelopers. The table reflects the cessation of the partnership between Devine and Montalvo after March 11, 1966.

| Territory Transferred | Devine's Portion of Gain | | |
|---|---|---|---|
| | 1965 | 1966 | 1967 |
| Mississippi–South | $ 10,000 | | |
| Mississippi–North | 12,500 | | |
| Mississippi–Other | 17,500 | | |
| Arizona | 41,250 | | |
| Louisiana–North | 3,750 * | | |
| Houston | 3,250 * | | |
| New Orleans | 7,500 * | | |
| Arkansas | 12,500 * | | |
| Palm Beach | 10,000 * | | |
| Ohio–Part | 1,000 * | $ 9,000.00 | |
| Kentucky–Part | 1,750 * | 15,750.00 | |
| South Carolina–Part | 4,400 * | 39,600.00 | |
| Expenses for above | –0– | (2.39) | |
| TOTAL PARTNERSHIP SHARE— 50% TO DEVINE | $125,400 | $ 64,347.61 | $ –0– |
| North Carolina | | $ 12,500.00 | $ |
| Nevada & Arizona | | 40,000.00 | |
| California–Part | | 37,500.00 | |
| Kansas–Part | | 7,500.00 | |
| Louisiana–Part | | 10.00 | 2,500 |
| California–Part | | 2,500.00* | |
| Indiana–Central | | | 5,000 |
| Icee of Ohio | | | 5,000 |
| Icee of San Diego | | | 4,000 |
| Mid–America Icee | | | 5,000 |
| Icee of East Bay | | | 2,500 |
| West Kansas | | | 100 |
| Sacramento | | | 5 |
| Icee of Los Angeles | | | 2,125 |
| Icee of Ventura | | | 5 |
| Icee of Kansas | | | 10,000 |
| Icee of California | | | 5,000 |
| Icee of New England | | | 10,000 |
| Icee of Imperial Valley | | | 2,500 |
| Icee of Prava | | | 3,750 |
| Icee of So. Colorado | | | 15,000 |
| Icee of Minnesota | | | 7,500 |
| Icee of California | | | 1,000 |
| TOTAL INDIVIDUAL & PARTNERSHIP SALES | $125,400 | $164,357.61 | $80,985 |

* Reported per return as short-term capital gain.

On their joint Federal income tax returns for the taxable years 1965 and 1966, [Judy] * * * and her then husband, Devine, reported Devine's partnership share from the transfers of franchise rights as gains from the sales of capital assets. On their joint Federal income tax returns for the taxable years 1966 and 1967, [the Devines] * * * reported as gains from the sales of capital assets Devine's individual gains and those of National Icee Corporation from the sales of franchise territorial rights.

In his statutory notice of deficiency, [the Commissioner] * * * determined that almost all proceeds received by Devine in these years from the transfer of franchise rights was either partnership ordinary income or individual ordinary income rather than capital gain. [34 T.C.M. (CCH) at 1077–1082.]

## OPINION

The broad question raised below was whether the proceeds realized by the Devines from the transfer of franchise rights constitute ordinary income or capital gains.

■ Capital gains treatment is, of course, only afforded proceeds from the "sale or exchange of a capital asset." I.R.C. § 1222. A "capital asset" is "property held by the taxpayer * * * but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." I.R.C.

§ 1221(1).[2] Thus, the proceeds can only be afforded capital gains treatment if: (1) there has been a "sale or exchange," and (2) the property transferred is a capital asset.

Noting that the tax years involved are prior to the effective date of I.R.C. § 1253,[3] the Tax Court relied upon [4] our pre-§ 1253 decision in *Moberg v. Commissioner,* 305 F.2d 800 (5th Cir. 1962) [5] for its conclusion that the franchise transfers constituted "sales" rather than receipts from licensing. The Tax Court further held, however, that the franchise rights were held by Devine primarily for sale to customers in the ordinary course of business and, accordingly, denied capital gains treatment for the proceeds from the transfer of those franchise rights.

██ The Commissioner has not taken a cross-appeal from the Tax Court's holding of a "sale." Therefore, the narrow issue before us is whether Devine held the franchise rights primarily for sale to customers in the ordinary course of business.[6] In deciding that issue, our power to review the lower court's determination is plenary and not limited to the clearly erroneous rule. *Potito v. Commissoner,* 534 F.2d 49, 52 n. 2 (5th Cir. 1976) (per curiam); *Biedenharn Realty Co., Inc. v. United States,* 526 F.2d 409, 416 n. 25 (5th Cir. 1976) (en banc), *cert. denied* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976).

██ We recognize that "primarily" in § 1221(1) means "of first importance" or

2. § 1221(1):
For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include— (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

3. § 1253 only applies to transfers made after December 31, 1969. It reads, in pertinent part:
(a) General rule.—
A transfer of a franchise, trademark, or trade name shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name.
(b) Definitions.—
For purposes of this section—
(1) Franchise.—The term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area.
(2) Significant power, right, or continuing interest.—The term "significant power, right, or continuing interest" includes, but is not limited to, the following rights with respect to the interest transferred:
(A) A right to disapprove any assignment of such interest, or any part thereof.
(B) A right to terminate at will.
(C) A right to prescribe the standards of quality of products used or sold, or of services furnished, and of the equipment and fa-

cilities used to promote such products or services.
(D) A right to require that the transferee sell or advertise only products or services of the transferor.
(E) A right to require that the transferee purchase substantially all of his supplies and equipment from the transferor.
(F) A right to payments contingent on the productivity, use, or disposition of the subject matter of the interest transferred, if such payments constitute a substantial element under the transfer agreement.
So found by the Tax Court, it appears clear that under § 1253 the present transfers could not be construed as "sales."

4. In *Golsen v. Commissioner,* 54 T.C. 742 (1970), *aff'd.* 445 F.2d 985 (10th Cir. 1971), *cert. denied* 404 U.S. 940, 92 S.Ct. 284, 30 L.Ed.2d 254 (1971), the Tax Court held:
[I]t is our best judgment that better judicial administration requires us to follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone. [*Id.* at 757]
Consequently, the Tax Court followed our *Moberg* decision though expressing disagreement therewith and citing other authority to the contrary.

5. In *Moberg,* one of the so-called Dairy Queen cases, we held that a sale occurred despite numerous contract restrictions. The restrictions present in *Moberg* are similar to restrictions found in the instant case.

6. Though initially Judy Devine raised an issue of jurisdiction and surprise relative to the Tax Court's holding that the franchise rights were held primarily for sale in the ordinary course of

"principally," *Malat v. Riddell,* 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966), and that such an interpretation is consistent with the legislative purpose of differentiating between " 'profits and losses arising from the everyday operation of a business,' on the one hand (*Corn Products Co. v. Commissioner,* 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29) and 'the realization of appreciation in value accrued over a substantial period of time' on the other. *Commissioner v. Gillette Motor Co.,* 364 U.S. 130, 134, 80 S.Ct. 1497, 4 L.Ed.2d 1617)." *Malat v. Riddell,* 383 U.S. at 572, 86 S.Ct. at 1032. We are satisfied that the franchises here involved were held primarily for sale and not in expectation of appreciation in value.

Interpretation of the single word "primarily," however, does not satisfy the task involved in applying § 1221(1) in its entirety:

> In analyzing a case of this sort no rubrics of decision or rubbings from the philosopher's stone separate the sellers garlanded with capital gains from those beflowered in the garden of ordinary income.

*United States v. Winthrop,* 417 F.2d 905, 911 (5th Cir. 1969).

In *Winthrop* this court considered these factors:

> (1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. [417 F.2d at 910.]

In a unique factual context, this court considered the factors of "substantiality and frequency of sales, improvements, solicitation and advertising efforts, and brokers' activities" in *Biedenharn Realty Co., Inc. v.*

*United States,* 526 F.2d at 415. The Tax Court considered similar factors in the present case:

> [T]he taxpayer's purpose at the time of acquisition of the property; the purpose for which the property was held during the years in issue; the continuity, number, frequency and substantiality of sales or sales-related activities over a period of time; the normal course of the taxpayer's principal business and the relationship of the sales in issue to that business; the activities of the seller in the improvement and disposition of the property, as well as the proximity of the sale to the prior purchase; the relative amount of income from a taxpayer's principal business to that received from the sales in dispute; the language of relevant contracts; and the existence of a seller's market making unnecessary any sales activity or advertising of the property sold. [Citations omitted. 34 T.C.M. (CCH) at 1084.]

In her main brief, Judy Devine based her argument on the "factors" cited by the Tax Court. The Commissioner, on the other hand, presented arguments based on the *Biedenharn* factors. In her reply, Judy Devine joined issue with the Commissioner on the *Biedenharn* factors.

Whatever "factors" are considered, whether from any of the three lists quoted above or otherwise, such factors must be applied to the particular case at hand, and adjectives like "substantial" and "frequent," applied to sales without a standard of comparison, are seen as substantially subjective terms of qualification. In short, though all of the listed factors may serve as guides in the decisional process, no one factor, and no one list of factors, may control. The sole test remains the application of the statute to the totality of the circumstances presented. Though the statute may be imprecise and difficult of application, it must be applied on a case-by-case basis.

The Tax Court found: "[t]he sales of subfranchises were regular and periodic over a three-year period: 12 were sold in 1965, 9 in 1966, and 18 in 1967 for a total of 39 in all." 34 T.C.M. (CCH) at 1084. The

franchise sales at issue generated income to Devine of $125,400 in 1965, $164,357.61 in 1966, and $80,985 in 1967. Though the record is unclear regarding the percentage of Devine's franchise sales to total income, Devine points to National Icee's gross income of over $2,000,000 in 1967, in arguing that the $80,985 franchise sales in that year were insubstantial. The Commissioner counters, pointing to approximately $29,000 of net income for Devine in 1967. As above indicated, however, no one factor can be decisive and the controlling criterion cannot be a comparison of the amount received from franchise sales with an amount received as a result of other income-producing activities. The Tax Court correctly focused on the nature and extent of Devine's franchise selling activities, in findings amply supported in the record:

* * * Devine's sole business activity during 1965, 1966 and 1967 was the continuing development and sale of territorial Icee franchise rights. Moreover, nearly all of the income reported by petitioner and Mr. Devine in these years consisted of either partnership franchise income, or income from the transfer of franchise rights by Devine alone or through his appointed agent, the National Icee Corporation, of which he was president. Furthermore, Devine was in the business of developing and conveying franchise rights in various territories under all relevant contracts and he was obligated[7] (and obligated others) to develop the territories through subfranchising and splitting the lump sum, royalty, and rental

payments with Mitchell for each franchise sold. Devine testified that he acquired and held Icee franchise rights with the intention of developing territories and, where feasible, selling rights to subfranchisers: * * * Although there was evidence of extensive advertising of Icee products, actual sales activity and advertising of individual franchises were unnecessary after Devine or Montalvo had "worked up" demand for the Icee product in a given territory. Noting Devine's personal and continuous involvement with the development and disposition of individual Icee franchises, we are convinced that the posture of Devine during the years in issue was that of an Icee businessman dealing with Icee customers who purchased Icee franchise rights from Devine in the ordinary course of Devine's business. * * * [34 T.C.M. (CCH) at 1084–85.]

Thus, we find no error in the Tax Court's conclusion that Devine held the franchise rights primarily for sale to customers in the ordinary course of business.

Accordingly, the judgment of the Tax Court is affirmed.

AFFIRMED.

business, that issue was specifically abandoned by Judy Devine's counsel during oral argument.

7. Though Judy Devine argues that Devine was under no obligation to sell subfranchises, it was agreed in paragraph 12 of the October 14, 1965 agreement, that:

Developers [Devine and Montalvo] shall have the right and the *responsibility* to make arrangements with Sub-developers for the development and maintenance of leasing and servicing ICEE Dispensers * * *. [Emphasis added.]

And, in paragraph 13 of the same agreement, it was agreed that Devine and Montalvo would pay $1/4$¢ a cup royalty if they developed a territory themselves, and only $1/8$¢ royalty if they subfranchised.