JAMES O. TOMERLIN TRUST, TRANSFEREE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16219-85. Filed October 29, 1986.

*Roland K. Martin, Jr.*, for the petitioner.
*Kenneth A. Burns*, for the respondent.

KÖRNER, *Judge*: By statutory notice of deficiency dated March 26, 1985, respondent determined that petitioner was liable, as transferee, for the following deficiencies of personal holding company tax of Cyclo Automotive, Inc., for the years and in the amounts as follows:

| Years | Deficiency in personal holding company tax |
|-------|-----|
| 1979 | $37,625 |
| 1980 | 1,394 |
| 1981 | 24,262 |
| 1982 | [1] 29,895 |

The ultimate issue presented involves the liability of Cyclo Automotive, Inc., for personal holding tax under section 541.[2] To resolve this ultimate issue, we must decide whether certain payments made in the years in question to Cyclo Automotive, Inc., constitute income from the sale of an asset under section 1253, or royalty income within the meaning of section 543.

## FINDINGS OF FACT

Petitioner is a trust with its principal place of business at Gardnerville, Nevada. Petitioner is the transferee of assets of Cyclo Automotive, Inc. (Automotive), a dissolved Nevada corporation. Automotive's income tax returns for the years 1979 through 1983 were filed with respondent's Ogden Service Center.

William R. Tomerlin and James O. Tomerlin purchased the stock of Automotive in approximately 1971. For the years 1979 through 1982 inclusive, the shareholders of

---

[1] Respondent now concedes that, because of a computational error, the correct amount for this year should be $21,353.

[2] All statutory references are to the Internal Revenue Code of 1954 as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

Automotive were William R. Tomerlin, who owned 50 percent of the stock, and James O. Tomerlin or his testamentary trust, which owned the other 50 percent of the stock. Automotive was an automobile chemical company selling various automotive products, such as carburetor cleaner, penetrating oil, white grease and various other lubricating and cleaning products. Certain of these products were covered by the registered trademark "CYCLO," which was owned by Automotive.

Accra-Pac, Inc. (Accra-Pac), was an Indiana corporation, apparently owned by parties unrelated to the Tomerlins. On February 3, 1976, a contract was entered into between William R. Tomerlin and James O. Tomerlin, as shareholders of Automotive; Automotive (described as licensor); and Accra-Pac (described as licensee). The contract first recited that Licensor was the owner of the trademark "CYCLO" which was a "strong mark in connection with the sale and distribution of oil lubricants for automobiles and other vehicles", and that "the parties desire to agree to the exclusive license and use by Licensee of the Trademark in producing, selling and distributing these products in the United States and throughout the world."

After these recitals, the operative provisions of the contract, as relevant and material herein, were as follows:

A. LICENSE. Licensor grants to the Licensee the exclusive right to use, and the Licensee undertakes to use, the trademark CYCLO in the United States and throughout the world, in connection with those products known to the parties and listed in Exhibit "A", attached hereto and made a part of this Agreement and for all new products that may be developed by Licensee during this Agreement.[3]

B. QUALITY OF GOODS. The Licensee shall manufacture, distribute and sell the products listed in Exhibit "A" and any new products according to the same standards of quality existing concerning such products. Licensor, however, shall have the right to inspect the operation of Licensee in order to insure the application of satisfactory quality control and the maintenance of same throughout the term of this Agreement.

C. EXCLUSIVE USE OF TRADEMARK.

A. Licensor agrees that Licensee's right to use the Trademark shall be sole and exclusive; and that no other persons or parties have any right or license to the use of the Trademark, or will be given any such right or

---

[3]Exhibit "A" attached to the contract listed certain products then manufactured and sold by Automotive under the trade name "CYCLO."

license during this Agreement. Licensor agrees that it will take all necessary and appropriate action to protect this Trademark against infringement or any other unlawful use and will, at all times, take all action necessary to keep the Trademark strong.

B. Licensor agrees that it will not, during this Agreement, carry on any business activity in which the Trademark is used, or carry on or engage in any business involving the Products covered by this Agreement.

D. With respect to terms of payment, the contract provided that licensee should pay to licensor as follows:

(1) With respect to the CYCLO products covered by Exhibit "A," the sum of 9 cents per can for the first 1 million cans produced by licensee each year, and thereafter at the rate of 4 cents per can of product. On an annual basis, such payments were to be scaled upwards or downwards depending upon changes in the Bureau of Labor Statistics Cost of Living Index.

(2) With respect to new products developed and sold by Accra-Pac under the CYCLO label, the same schedule of payments was to apply, except that no payments would be due with respect to new products for the first year of production thereof.

(3) Payments were to be made by licensee to licensor on a monthly basis.

E. It was agreed that the contract would continue and renew itself automatically from year to year, so long as licensee had paid to licensor at least $40,000 biannually in productivity payments in any year. The licensee was to make an accounting of its sales periodically to licensor, and licensor had the right to inspect books of licensee with regard to production of product covered by the CYCLO trademark. The contract was terminable only:

(1) Upon 60 days written notice from licensee to licensor prior to the end of each 6-month period; or

(2) Upon failure of the licensee to make the payments provided for in the contract.

F. Licensee acknowledged the ownership of the trademark by licensor. However, if and when the point arrived when licensee had paid licensor contingent production payments equal to $1 million, then at that time licensor was obligated to transfer all right, title and interest in the trademark to licensee. In such event, licensee was to continue to make productivity payments to licensor for the indefinite future

upon a certain stated basis. Prior to the payment of $1 million by licensee to licensor (and the consequent transfer of title to the trademark to licensee), the contract provided that the licensee "will not sell the CYCLO business independently or separate from an overall sale of Accra-Pac, Inc. Should it be determined that licensee be desirous of assigning the CYCLO business then same shall not be done without prior approval of licensor but said approval shall not be unreasonably withheld."

The above agreement was in effect between Automotive and Accra-Pac throughout the period in question, and, under the terms of this agreement, Automotive received and reported the following income:

| Year | Payments from Accra-Pac | Other income |
|------|------------------------|--------------|
| 1979 | $118,510 | $917 |
| 1980 | 128,866 | 183 |
| 1981 | 115,098 | 132 |
| 1982 | 121,732 | 13,317 |

At the time of the liquidation and dissolution of Automotive in December 1982, title to the trademark had not yet been transferred to Accra-Pac, and the above contract was distributed by Automotive to its shareholders in liquidation. Petitioner thus received assets in liquidation of Automotive in an amount at least equal to the total deficiencies, as corrected, as determined by respondent against Automotive.

## OPINION

The instant case involves a dispute as to the liability of petitioner's transferor, Automotive, for the personal holding company tax under sections 541, et seq. With respect to Automotive, there is no dispute between the parties that the stock ownership requirements of section 542(a)(2) are met. Nor does there appear to be any dispute that Automotive qualifies as a personal holding company under the income requirements of section 542(a)(1), if it is determined that the payments here in question constitute royalty income, as opposed to income from the sale of an asset, nor that, in such event, respondent's computation of personal

holding company tax liability is correct.[4] Petitioner likewise concedes that all the payments in question, even if considered to be the proceeds of sale, are to be treated as ordinary income under the provisions of section 1253. Finally, petitioner concedes that it is a transferee of the assets of Automotive, within the meaning of section 6901, to the full extent of the liability of Automotive as determined by respondent herein, if such liability is found to exist.

Thus, the only issue which we must resolve is whether the payments made by Accra-Pac to Automotive in the years in issue, pursuant to the contract between them of February 3, 1976, constituted royalty payments under a licensing agreement of a trademark, or constituted payments pursuant to a contract of sale of an asset.

Respondent, relying upon the provisions of section 1253, as well as the contract itself, argues that, as a matter of fact as well as law, the contract between Automotive and Accra-Pac was nothing more than a license by the former to the latter to use and exploit a trademark which Automotive owned; that Automotive retained title to the trademark for an indefinite period; and that Automotive retained such substantial rights and interests in the trademark under the terms of the contract that no sale of the trademark resulted, with the further result that the payments by Accra-Pac to Automotive under the contract must be held to be royalties within the meaning of section 543(a)(1).

Petitioner, on the other hand, citing a number of cases decided prior to the enactment of section 1253 (and some involving patents rather than trademarks), urges us to find and hold that the contract herein, correctly construed, was not a license but rather involved the sale of the entire business of Automotive to Accra-Pac. As such, petitioner urges, the payments made by Accra-Pac to Automotive should be considered as the proceeds of a sale of assets, rather than as royalty income from a license, even though, concededly, such payments are to be treated as ordinary income in the hands of Automotive because of the specific provisions of section 1253.

In support of this line of argument, petitioner reminds us that it has been held that the name given to an agreement

---

[4] See note 1 *supra.*

is not conclusive as to the substance of the transaction, citing *Waterman v. Mackenzie*, 138 U.S. 252 (1891); *Hickman v. Commissioner*, 29 T.C. 864, 872 (1958); *Kimble Glass Co. v. Commissioner*, 9 T.C. 183, 189 (1947). Even where the agreement is called a license (as here) and the parties are referred to as "licensor" and "licensee," the terms are not determinative. If it appears from the agreement and the surrounding circumstances that the parties intended a transfer of all rights in and to an asset, such intention will be given effect, regardless of the words used. *Bell Intercontinental Corp. v. United States*, 180 Ct. Cl. 1071, 381 F.2d 1004 (1967); *Puschelberg v. United States*, 330 F.2d 56 (6th Cir. 1964); *Reid v. Commissioner*, 26 T.C. 622, 632 (1956). The earlier cases have also held, however, that where less than all rights to an asset are transferred, there may only be a license, not a sale. *Walen v. United States*, 273 F.2d 599 (1st Cir. 1959); *Kimble Glass Co. v. Commissioner, supra.*

Petitioner points particularly to the case of *Kavanagh v. Evans*, 188 F.2d 234 (6th Cir. 1951), in which it was held that where there was a full "license" of all rights to manufacture, use, and sell products covered by a patent for the full life of the patent, there was in fact a sale of the patent. Even though title to the patent was not to be transferred until certain payments were made, the "licensee" became the equitable owner of the patent rights covered by the agreement. Further, petitioner points to the prior holding that the fact that a grantor of a license can terminate the agreement under certain conditions does not negate the fact of a sale; such rights are viewed as conditions subsequent in the event of a default in performance under the contract. *Bell Intercontinental Corp. v. United States, supra.*

We do not disagree with the general propositions, urged by petitioner, that the nomenclature or labels which the parties use in a contract are not necessarily determinative of its true nature, which is to be ascertained from the entire content and thrust of the contract provisions. Nor do we disagree with the general proposition, enunciated in the cited earlier cases, that a contract which transfers all substantial rights to an asset from the grantor to grantee, reserving no significant rights or interests in the grantor,

may be held to be the sale of an asset rather than a mere license thereof, in spite of the terms used. The problem remains, however, to determine what constitutes such retained substantial rights or interest in a given case, so as to make the transaction a license rather than a sale. This problem brings us face to face with section 1253.

By 1969, there had apparently arisen some confusion and uncertainty in the law with respect to sales vs. licenses of trademarks and franchises. Congress addressed these concerns in the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, and in section 516(c)(1) of that act, Congress added section 1253 to the Code as an attempted legislative solution to the problem.

The legislative history is instructive. In the Senate Finance Committee report on the pending bill, and as a background for the enactment of the new section 1253 of the Code, the Committee said, in relevant part:

Present law.—Questions have arisen under present law concerning the proper tax treatment of the transferor and the transferee of a franchise. A similar situation exists in the case of tranfers of trademarks and trade names.

It is difficult to resolve under present law whether the transfer of a franchise, trademark, or trade name is to be treated as a sale or as a license, and whether the transferors are selling franchises, trademarks, and trade names in the ordinary course of business. Depending upon how these questions are resolved, the transferor will receive ordinary income or capital gains treatment on the gain he realizes on the transfer. At present, these problems must be resolved under general tax principles, and this has produced differing results in the courts, despite factual similarities in the interest of the franchises, trademarks, or trade names transferred.

For a transaction to receive capital gains treatment, property which is transferred must generally constitute a capital asset and must be sold or exchanged. It has been frequently necessary for the courts to determine whether a variety of conditions included in the agreement between the transferor and the transferee transform a purported sale into a license, thus requiring the gains from the transaction to be taxed as ordinary income.

This question has resulted in a division of authority among the courts, some finding a sale and others a license. In either case, the decisions generally have been based on varying conditions in the transfer agreement and, when the agreement has been interpreted as reserving significant powers, rights, or continuing interests to the transferor, then it has been held that such reservations preclude a finding of a sale.

\*     \*     \*     \*     \*     \*     \*

General reasons for change.—Since present law does not specifically deal with the transfer of a franchise, trademark, or trade name, and since there appears to be considerable diversity of opinion among courts as to whether such a transfer constitutes a license or a sale and whether part or all of the sale constitutes the sale of a capital asset, the committee agrees with the House that Congress should clarify these problems through legislation with regard to franchises. In addition, the committee believes this should encompass trademarks and trade names and also the treatment of transferees in these cases insofar as the deductibility of the payments they make to transferors is concerned.

Some transferors retain significant powers, rights, or continuing interests with respect to the subject matter of the franchise, trademark, or trade name. The committee believes that if the transferor exercises continuing, active, operational control of a franchise, trademark, or trade name, by retaining significant powers, rights or continuing interests, that this exercise of control is inconsistent with a sale or exchange of property.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

In many cases the question whether the transfer of a franchise, trademark, or trade name results in capital gain or ordinary income to the transferor could be resolved with reference to whether the property was held primarily for sale in the ordinary course of business.

$$* \quad * \quad * \quad * \quad * \quad *$$

Explanation of provisions.— * * *

The committee amendments provide that the transfer of a franchise, trademark, or trade name is not to be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name. Thus, a transferor is not to receive capital gains treatment in these cases. If the transfer agreement includes significant conditions or restrictions which are subject to the transferor's approval on a continuing basis, this power to exercise continuing, active, operational control over the transferee's business activities is to be considered as a retention by the transferor of a significant power, right, or continuing interest. Moreover, if the transferor's conduct constitutes participation in the commercial or economic activities of the transferee's business, then this also is to be regarded as a retention of a significant power, right, or continuing interest. These rules also were contained in the House bill, but only with respect to franchises.

Under the committee amendments the concept of a "significant power, right, or continuing interest" is to include, but is not to be limited to: (A) a right to disapprove any assignment or any part thereof; (B) a right to terminate at will; (C) a right to prescribe the standards of quality of products used or sold or of services furnished, and of the equipment and facilities used to promote such products or services; (D) a right to require that the transferee sell or advertise only products or services of the transferor; (E) a right to require that the transferee purchase substan-

tially all of his supplies and equipment from the transferor; (F) and a right to payments contingent on the productivity, use or disposition of the subject matter if such payments constitute a substantial element under the transfer agreement. The House bill in effect only included factors (A) and (B) above in the concept of a significant power, right, or continuing interest.

In addition, the committee amendments (but not the House bill) provide that all amounts received or accrued by the transferor on account of a transfer, sale, or other disposition of a franchise, trademark, or trade name, which are contingent on the productivity, use, or disposition of the franchise, trademark, or trade name transferred are to be treated as ordinary income. Contingent payments would include continuing payments (other than installment payments of a principal sum agreed upon in the transfer agreement) measured by a percentage of the selling price of products marketed or based on the units manufactured or sold, or any other similar method based upon production, sale or use, or disposition of the franchise, trademark, or trade name transferred.

[S. Rept. 91-552, at 207-210 (1969), 1969-3 C.B. 423, 554-556.]

The language of the Conference Committee report on the bill was not substantially different:

The Senate amendment makes more specific the rules of the House bill and extends these rules to trademarks, and trade names. A "franchise" includes "an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area." A "significant power, right, or continuing interest" includes, but is not limited to, a right to disapprove any assignment; a right to terminate at will; a right to disapprove any assignment; a right to require exclusive sale or advertising of products or services of the transferor; a right to require exclusive purchases of supplies and equipment from the transferor; and a right to payments contingent on productivity if such payments constitute a substantial element under the transfer agreement.

Under the Senate amendment, contingent payments are treated as ordinary income and are deductible by the transferee as trade or business expenses.

[Conf. Rept. 91-782 (1969), 1969-3 C.B. 644, 669.]

As enacted, and effective for transfers after December 31, 1969, section 1253 provides in relevant part as follows:

SEC. 1253. TRANSFERS OF FRANCHISES, TRADEMARKS, AND TRADE NAMES.

(a) GENERAL RULE.—A transfer of a franchise, trademark, or trade name shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name.

(b) DEFINITIONS.—For purposes of this section—

(1) FRANCHISE.—The term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area.

(2) SIGNIFICANT POWER, RIGHT, OR CONTINUING INTEREST.—The term "significant power, right, or continuing interest" includes, but is not limited to, the following rights with respect to the interest transferred:

(A) A right to disapprove any assignment of such interest, or any part thereof.

(B) A right to terminate at will.

(C) A right to prescribe the standards of quality of products used or sold, or of services furnished, and of the equipment and facilities used to promote such products or services.

(D) A right to require that the transferee sell or advertise only products or services of the transferor.

(E) A right to require that the transferee purchase substantially all of his supplies and equipment from the transferor.

(F) A right to payments contingent on the productivity, use, or disposition of the subject matter of the interest transferred, if such payments constitute a substantial element under the transfer agreement.

(3) TRANSFER.—The term "transfer" includes the renewal of a franchise, trademark, or trade name.

(c) TREATMENT OF CONTINGENT PAYMENTS BY TRANSFEROR.—Amounts received or accrued on account of a transfer, sale, or other disposition of a franchise, trademark, or trade name which are contingent on the productivity, use, or disposition of the franchise, trademark, or trade name transferred shall be treated as amounts received or accrued from the sale or other disposition of property which is not a capital asset.

In the context of the controversy presented in the instant case—whether the contract in question represented a sale or a license of the trademark "CYCLO"—a close reading of the above quoted portions of section 1253 is revealing, both for what the statute does as well as for what it does not do. Thus, sections 1253(a) and 1253(b), read together, provide that if the transferor of a franchise, trademark, or trade name retains any of the significant powers, rights, or continuing interests specified in section 1253(b)(2), then any such transfer "shall not be treated as a sale or exchange of a capital asset." As a result, any payments received by the transferor under such contract will be treated as ordinary income in the hands of the the transferor.

What section 1253(a) does *not* say is that such a transfer shall not be treated as a sale at all. Thus, as to transfers of trademarks occurring after December 31, 1969, to which section 1253(a) applies, various possibilities exist: (a) That

the transfer is a true sale of an asset which is a capital asset in the hands of the transferor, so that the proceeds therefrom qualify for capital gains treatment (subject however to the provisions of section 1253(c), discussed *infra*); (b) that the transfer is a true sale of a capital asset, but the proceeds therefrom are to be treated as ordinary income because the transferor has retained one or more of the significant powers detailed by section 1253(b)(2); (c) that the transfer is a true sale, but that the trademark constitutes an asset held for sale to customers in the ordinary course of business, and is therefore not a capital asset within the meaning of section 1222, with the result that the proceeds therefrom are to be treated as ordinary income; or (d) that the transfer is not a true sale at all, but is a mere license, so that the proceeds therefrom are to be treated as ordinary income.

Thus, although sections 1253(a) and 1253(b), read together, tend to bring some clarity to the confused condition of the law by enumerating specific instances when the proceeds of sale of a trademark, even though a capital asset in the transferor's hands, are to be given ordinary income treatment, section 1253 undertakes to provide no new clear standard to determine whether the transaction is a sale or a license, nor to determine whether the trademark is a capital asset or an asset held for sale to customers in the ordinary course of business.[5]

Section 1253(c), in turn, provides that even where a sale of a trademark, franchise, or trade name has taken place, and even if such sale is otherwise to be treated as the sale of a capital asset, nevertheless any sale proceeds which are made contingent upon the productivity, use, or disposition of the asset by the transferee shall be treated as ordinary income in the hands of the transferor. Thus, it is possible for a transfer of a trademark, otherwise qualifying as the sale of a capital asset, to receive capital gains treatment with respect to the proceeds of sale which are not contingent upon production or use, whereas those portions of the sales proceeds which *are* contingent upon production or use, even if not a "substantial element" under the transfer

---

[5]See and compare sec. 1.871-11(c), Income Tax Regs.

agreement (see sec. 1253(b)(2)(F)), are to be given ordinary income treatment.

In the case now before us, therefore, section 1253 does not provide the answer. The parties have already stipulated that all the proceeds of the transfer of the "CYCLO" trademark in this case are to be treated as ordinary income under section 1253. We cannot tell whether this stipulation is based upon the fact that Automotive retained a "right to productivity" payments under the contract which constituted a "substantial element under the transfer agreement," within the meaning of section 1253(a)(2)(F), or whether the parties were in agreement that all the payments to be received by Automotive under the contract constituted payments based upon production or use, within the meaning of section 1253(c). In either event, the result is the same, and therefore we do not need to resolve the point.

What remains, however, is the disputed question as to whether there was a sale at all of the trademark, or merely a license to use the same. On this troublesome question, section 1253 provides no answer, and we are told that this new section is not to be consulted as a guide to a codification of the rules in effect prior to its enactment. *Conde Nast Publications, Inc. v. United States*, 575 F.2d 400 (2d Cir. 1978); *Consolidated Foods Corp. v. United States*, 569 F.2d 436 (7th Cir. 1978). We are therefore remitted to the confusing and sometimes contradictory state of the law as it existed prior to the enactment of section 1253. As the Court of Appeals said in *Consolidated Foods Corp. v. United States*, 569 F.2d at 437:

> This issue of whether a transfer of the use of a trademark is a sale or a license for tax purposes is a thorny one, and has not always been consistently solved in the courts. The basic problem is to determine the extent to which the transferor retains proprietary rights in the transferred asset. If the transferor retains sufficient proprietary rights, the transfer must be considered a license rather than a sale. The relevant case law lacks clear standards as to how restrictive the agreement may be before it constitutes a license rather than a sale, and, indeed, reflects a splintering of authority among the several courts of appeals. * * *

In *Conde Nast Publications, Inc. v. United States, supra,* the Court of Appeals for the Second Circuit held that the terms of a 1961 transfer of a trademark and trade name

constituted a sale rather than a license, since the transferor retained no significant rights or interests in the asset transferred, or control of the business in the hands of the transferee. The retention by the transferor of the right to inspect for quality control, and the right to terminate the agreement under certain circumstances, were held to be no more than legitimate steps to protect the value of the trademark which was to be the source of the payments to the transferor.

In the same year, however, and under somewhat similar facts, the Court of Appeals for the Seventh Circuit in *Consolidated Foods Corp. v. United States, supra*, concluded that the rights retained were sufficiently extensive so that the transaction should be considered a license rather than a sale.

In *Devine v. Commissioner*, 558 F.2d 807 (5th Cir. 1977), affg. T.C. Memo. 1975-251, this Court had held, after analyzing the various factors in the relevant contract, including the rights retained by the transferor, that (a) there had been a sale rather than a license, and (b) that the franchise which was sold was not a capital asset, so that payments received were to be treated as ordinary income. Noting that the issue of sale versus license had not been appealed by the Commissioner, the Court of Appeals affirmed the holding of the Tax Court that the payments in question were to be treated as ordinary income from the sale of an asset held for sale to customers in the ordinary course of business.[6]

Finally, in *Republic Automotive Parts, Inc. v. Commissioner*, 68 T.C. 822 (1977), affd. 611 F.2d 645 (6th Cir. 1979), this Court held that where the grantor gave the grantee in 1955 the right to use a trademark and trade name for only 15 years, also reserving the right to supervise quality control and to prevent the further assignment of the trademark without the grantor's consent, the transaction was to be treated as a license, not a sale. The holding of the

---

[6]The Court of Appeals, noting that sec. 1253 did not apply to the transaction before it, which occurred prior to 1970, nevertheless opined in dictum that, if sec. 1253 *were* to be applied to the facts before it, the transfer "could not be construed as 'sales.'" *Devine v. Commissioner*, 558 F.2d 807, 813 n. 3 (5th Cir. 1977). However, as we have noted, sec. 1253 does not purport to lay down any new rule governing the determination of whether a sale or a license of a trademark actually takes place.

case, however, appears to be based primarily upon the fact that the 15-year term of the contract was well short of the useful life of the trademark, so that the grantor was held to have retained substantial ownership rights in the asset after the expiration of the contract.

Further discussion of the numerous cases which have decided this issue one way or the other would not appear to be particularly helpful, and we conclude that we must therefore examine the contract provisions in the case before us, in order to determine whether Automotive retained such substantial rights and interests that it must be held that a license rather than a sale occurred.

Initially, we reject petitioner's contention, advanced at trial and on brief, that the contract in question here involved the sale of the entire business of Automotive rather than of the trademark "CYCLO." The contract provisions are clearly limited to the trademark, and to products manufactured and sold under that trademark—both the specific products enumerated in the contract, as well as new products that might be developed later by Accra-Pac. We find no ambiguity in the contract provisions with respect to the subject matter of the contract. It was a right, under the terms and conditions stated, to acquire, use and exploit the trademark "CYCLO," and it did not purport to encompass any other assets of automotive, including any other patents or trademarks which automotive might own, or any products not then covered by the "CYCLO" trademark. Whether Automotive owned any such assets at the time the instant contract was entered into in 1976 does not appear from this record, but it is clear to us that nothing further was intended.

Examining the contract provisions themselves, we conclude that what was intended here and what in fact happened was a sale rather than a license of the trademark. In reaching this conclusion, we find the following contract provisions controlling: (a) The grant of the trademark by Automotive to Accra-Pac was exclusive, worldwide, and forever, so long as Accra-Pac made the required production payments; (b) at such time as Accra-Pac had made production payments to Automotive of $1 million, Automotive was required to transfer legal title to the trademark to Accra-

Pac (as distinguished from a mere *option* in Accra-Pac to acquire such title); (c) Automotive had no right to terminate the agreement, except upon the failure of Accra-Pac to make the required periodic payments; furthermore, after the transfer of title to the trademark from Automotive to Accra-Pac, such termination rights no longer applied, even if Accra-Pac failed to make the required continuing payments; (d) although Accra-Pac was not permitted to dispose of the portion of the business using the trademark "CYCLO" separately from a sale of Accra-Pac's entire business, without Automotive's prior approval, "said approval shall not be unreasonably withheld." We regard this as nothing more than providing Automotive with reasonable security to insure that the trademark would not fall into the hands of those who would mismanage it and destroy its value; (e) Automotive retained the right to inspect the business operations of Accra-Pac to insure continuing quality control. Here again, however, we regard this as nothing more than a reasonable right which Automotive could retain to insure that the trademark, which was the asset intended to produce the production payments, would not be mismanaged so that its ability to produce income was destroyed (see *The Conde Nast Publications Inc. v. United States, supra*); and (f) finally, Automotive agreed that it would not use the trademark any further, nor engage in any business involving the products covered by the trademark which was conveyed to Accra-Pac.

We therefore hold that under the contract in question, Automotive parted with all its substantial rights, both present and future, in and to the trademark, reserving to itself only such limited rights as were reasonable and appropriate so that it could safeguard the integrity of the asset which was intended to produce the income for it. Even though the title to the patent was not to be transferred until a later date, and until a certain level of payments was reached, we hold that Accra-Pac became the equitable owner of the patent rights covered by the agreement upon execution of the contract on February 3, 1976. *Kavanagh v. Evans, supra.* See and compare *Bell Intercontinental Corp. v. United States, supra; Reid v. Commissioner, supra.*

Since we hold that the contract involved in this case resulted in a sale, rather than a license, the second aspect of the problem presented to us is resolved. For personal holding company purposes, the income derived from the sale of the CYCLO trademark may be ordinary gross income, within the meaning of section 543(b)(1), but, as income from the sale of an asset, it does not ipso facto constitute royalties within the meaning of section 543(a)(1).[7] Since our findings show that Automotive's adjusted ordinary gross income in the years in question was not composed of personal holding company income to the extent of 60 percent or more, within the meaning of section 542(a)(1), absent the payments here in question, it results that Automotive was not a personal holding company liable for the tax imposed by section 541 in the years before us.

*Decision will be entered for the petitioner.*

---

[7] Both parties cite and rely upon a portion of respondent's proposed regulations in this regard. Proposed Treasury Reg. sec. 1.1253-1(b), 36 Fed. Reg. 13148 (July 15, 1971), provides in relevant part:

"However, treatment of such amounts as ordinary income is not determinative as to whether such amounts will be treated as royalty for purposes of any section of the Code specifically relating to royalties. Such determination shall be made pursuant to such section of the Code."

As we most recently said in *Driggs v. Commissioner*, 87 T.C. 759 (1986):

"Although our opinion does not conflict with the proposed regulations, we do not rely upon them as authority because they 'carry no more weight than a position advanced on brief by the respondent.' " *F.W. Woolworth Co. v. Commissioner*, 54 T.C. 1233, 1265-1266 (1970); *Miller v. Commissioner*, 70 T.C. 448, 460 (1978). See also *Mearkle v. Commissioner*, 87 T.C. (1986).